*In re* ESTATE OF EDWARD KAMINSKI, Deceased (J. Stirling Mortimer, Special Adm'r of the Estate of Edward Kaminski, Petitioner-Appellee, v. Leon Sender, Respondent-Appellant).

First District (4th Division)   No. 1—87—3628

Opinion filed June 14, 1990.

Medard M. Narko & Associates, of Oak Forest, for appellant.

J. Stirling Mortimer, of Dolton, appellee *pro se.*

JUSTICE JOHNSON delivered the opinion of the court:

Respondent, Leon Sender, appeals from the order and judgment of the circuit court of Cook County that ordered him to remit to the estate of Edward Kaminski, deceased, the sum of $49,000, less credit for any amount previously paid to Kaminski. The following issues are raised on appeal: (1) whether the trial court failed to consider the presumption favoring the transfer of real estate to respondent; (2) whether the special administrator failed to bear the burden of showing by clear and convincing evidence that a fiduciary relationship ex-

isted between respondent and Kaminski; (3) whether the trial court's factual findings were supported by the evidence; (4) whether the transfer of real estate to respondent was pursuant to an agreement between respondent and Kaminski that had been fully performed by the parties; (5) whether the trial court erred in inquiring into Kaminski's mental capacity; (6) whether the trial court erred in allowing the previously removed executrix to testify as to alleged conversations she had with Kaminski; (7) whether the trial court should have disqualified counsel who had previously represented respondent in another matter; and (8) whether a constructive trust was improperly imposed upon the proceeds from the sale of the real estate in question.

We affirm.

J. Stirling Mortimer, special administrator of the estate, brought a citation proceeding against respondent, the nephew and godchild of Kaminski, to recover property that the estate claimed Kaminski owned. The property, located at 6449 South Kedvale, in Chicago, had been Kaminski's place of residence until 1979. Title to the property had been held in a land trust since 1969. Beneficiaries to the land trust had at one time included respondent, but respondent was removed as a named beneficiary by Kaminski in 1978. In 1979 Kaminski, in ill health and saddened by the memories that the house brought of his deceased wife, moved to Indiana to live with a relative, Mary Zalesiak. Respondent testified that he provided for the maintenance of the property from 1979 until he sold the real estate in 1982.

In March or April 1982, Kaminski returned to Chicago. Respondent testified that during Kaminski's stay with him they had various conversations concerning the transfer and ownership of the property in question. Initially, respondent testified that the property was a gift from Kaminski. On appeal, respondent maintains that the property was transferred to him in the form of a sale. A real estate sales contract was never drafted that reflected the agreed upon purchase price of $40,000. According to respondent, the terms of the purchase were that he would pay Kaminski $300 per month, or more if needed, until the time of his uncle's death. Respondent could not, however, produce the memorandum reflecting these payment terms.

Subsequently, respondent instructed his attorney to prepare the necessary papers to effect transfer of the title. Once the papers were completed, respondent traveled to Michigan, where Kaminski then resided, to obtain his uncle's signature. Kaminski signed the papers without the benefit of counsel. The papers were notarized in Michigan on May 20, 1982. Although respondent testified at trial that he had explained the contents of the documents to his uncle and that his un-

cle said he understood the nature of the transaction, at respondent's deposition, he testified that he did not know if Kaminski understood the terms of the transaction.

On June 24, 1982, 34 days after the alleged transfer of the real estate, respondent sold the property in question to a third party for $49,000. Kaminski died on March 3, 1983, at the age of 71. Payments were made to Kaminski up to the time of his death. Respondent reported that the payments approximated $10,600.

Following a citation hearing, the trial court found that the transaction between respondent and Kaminski did not constitute a gift, but was, instead, "a questionable transaction where an individual of confidential relationship took advantage of the decedent." It further found that a fiduciary or confidential relationship existed whereby respondent used undue influence to procure the property. The trial court ordered respondent to remit $49,000, less credit for any monies paid to Kaminski, to the estate of Kaminski. It is from this order that respondent appeals.

■ In a citation proceeding, the testimony of a donee as to what was said to him by a deceased donor is a question of credibility and must be carefully scrutinized. (See *In re Estate of Shanahan* (1978), 59 Ill. App. 3d 269.) The trial court is in the best position to make a determination as to witness credibility and the weight to be afforded to the testimony. (*Metropulos v. Chicago Art Glass, Inc.* (1987), 156 Ill. App. 3d 727, 741.) The findings of the trial court are not to be disturbed unless they are against the manifest weight of the evidence. *Metropulos*, 156 Ill. App. 3d at 737.

■ Respondent first contends that the trial court ignored the presumption that a deed duly acknowledged and recorded effectively passes title of the property to the grantee. (*In re Estate of Shedrick* (1984), 122 Ill. App. 3d 861, 864.) This presumption, however, is not conclusive but rebuttable. (*Shedrick*, 122 Ill. App. 3d 861.) A transfer of property may be set aside because of undue influence or breach of a fiduciary or confidential relationship. *Crawford v. Krebs* (1976), 40 Ill. App. 3d 568, 573.

■ In the instant case, we do not find that the trial court ignored the presumption that an acknowledged deed may effectively transfer property; rather, the court found that there existed a confidential or fiduciary relationship which warranted imposing a constructive trust on the proceeds from the sale of the property. We do not find that the trial court's findings were against the manifest weight of the evidence.

The court considers the following factors in making its determina-

tion of whether a confidential relationship exists: the degree of kinship of the parties; the disparity in age; health and mental condition; education and business experience between the parties; and the degree of trust placed in the dominant party. (*Metropulos v. Chicago Art Glass, Inc.* (1987), 156 Ill. App. 3d 727, 737.) "Additionally, where a confidential relationship is found to exist, there is a presumption that the transaction complained of resulted from undue influence [citation], thereby shifting the burden to the other parties to establish the fairness of the transaction." *Metropulos*, 156 Ill. App. 3d at 737.

In the instant case, the trial court found, after carefully reviewing the records, hearing arguments from both parties, and evaluating the facts against the law in this area, that the evidence was clear and convincing that a confidential or fiduciary relationship existed between the parties and that respondent failed to rebut the presumption of undue influence. We do not find this holding to be against the manifest weight of the evidence.

The trial court gleaned from the facts presented at trial that all of the factors indicative of a confidential or fiduciary relationship were present in the instant case. Respondent was the nephew and godchild of Kaminski. The discrepancy in ages was approximately 24 years. Kaminski was in failing health and still emotionally distraught over his wife, who had died in 1971. Respondent was in the real estate business and had been a broker for more than 25 years. Kaminski was a retired employee of Crane Company in Chicago. There was no evidence presented that Kaminski had, at any time, any experience in the real estate business.

The high degree of trust placed in respondent by Kaminski is evidenced by the fact that respondent was co-tenant on several joint tenancy accounts with Kaminski; by respondent's own admission he was Kaminski's favorite relative; and, according to respondent, Kaminski discussed certain financial matters with respondent concerning Kaminski's assets. Kaminski had also advanced the sum of $10,000 to respondent at some point in time.

The court further noted that Kaminski did not have benefit of counsel at the time of the signing of the transfer documents. Respondent, on the other hand, had handled thousands of residential real estate transactions and also had the benefit of counsel. Although respondent's attorney was not present when Kaminski signed the transfer papers, he had drafted the transfer documents that were presented to Kaminski by respondent for signing. At respondent's deposition, he even testified that he did not know whether Kaminski understood the nature or consequences of signing the transfer docu-

ments. Under these circumstances, we do not find that the trial court erred in finding that respondent was clearly in the more advantageous or dominant position at the time of the alleged transfer.

The trial court also noted that there was some question as to whether Kaminski was of sound mind. This query was based, in part, on respondent's charge in a chancery action that Kaminski was not mentally competent in August of 1982 to demand any withdrawals from Kaminski's account. Respondent testified that even Kaminski's signature "was not in his usual form."

Although mental capacity to engage in a transfer must be made at the time of the conveyance (*In re Estate of Clements* (1987), 152 Ill. App. 3d 890, 894), we find that the trial court did not err in finding Kaminski's mental capacity questionable at the time of the alleged transfer, since respondent's allegations of incompetency came only a few months after Kaminski signed the transfer documents.

Based upon the above facts, we do not find that the trial court erred in finding a confidential or fiduciary relationship between respondent and Kaminski. Nor did the trial court err in finding that respondent had not rebutted the presumption of undue influence. Based upon a careful review of the record, we find that the trial court's findings were supported by the evidence.

■ Respondent next contends that the transfer of real estate was pursuant to a valid agreement that had been fully performed by both parties. The only evidence of this agreement was respondent's testimony. Although respondent testified that there had been a written agreement, that alleged agreement has not been produced to date. Respondent now, in the alternative, argues that he had offered evidence of an oral agreement.

Respondent correctly argues that Illinois courts have recognized that oral agreements for the conveyance of land are enforceable when the contracts are fully executed. (See *In re Estate of Manikowski* (1967), 82 Ill. App. 2d 201.) However, we find that even assuming *arguendo* that a fully executed oral agreement was found to exist, the breach of a fiduciary or confidential relationship would warrant setting the agreement aside. We, therefore, find no merit in respondent's argument on this issue.

■ Respondent also argues that the trial court erroneously considered Kaminski's mental capacity without proof of mental infirmity. We disagree. Respondent's own sworn affidavit in the chancery court proceeding charged that Kaminski was mentally incompetent. Respondent also testified at his deposition that after reviewing the transfer documents, which had been prepared by respondent's attor-

ney, he could not ascertain whether Kaminski understood the nature of the documents or the resulting consequences that would arise from signing such documents. Further, mental condition is a factor that the court must consider in determining whether a confidential or fiduciary relationship exists. (*Metropulos v. Chicago Art Glass, Inc.* (1987), 156 Ill. App. 3d 727, 737.) The trial court, therefore, properly inquired into Kaminski's mental capacity.

■ Next, respondent contends that Anna Zalesiak, a previously removed executrix and sister of Kaminski, was improperly called as a witness by the special administrator and allowed to testify to conversations she had with Kaminski even though she was also an interested party. All witnesses in a citation proceeding are witnesses for the court, and the rules of evidence in such proceedings are to be liberally construed, particularly those rules under the Dead Man's Act (Ill. Rev. Stat. 1985, ch. 110, par. 8—201). (See *In re Estate of Vercillo* (1960), 27 Ill. App. 2d 151, 157.) "It is within the trial court's discretion to determine whether [such] testimony is necessary to a full and fair presentation of the facts of the case." *In re Estate of Shanahan* (1978), 59 Ill. App. 3d 269, 273.

■ We find that the trial court did not abuse its discretion in allowing the testimony of Anna. Anna was a witness for the court and not for the special administrator. She testified that her brother did not intend the transfer of the property to be a gift to respondent. This was in response to an allegation that was made, at one point, by respondent that the alleged transfer was a gift to respondent from Kaminski. We do not find that the trial court erred in determining that this was necessary in providing a full and fair presentation of the case. Further, Anna testified that Kaminski was of sound mind up until the time of his death. Competency of Kaminski at the time of the transaction would go to the validity of the transaction between Kaminski and respondent. If the transaction were found to be valid, the proceeds from the sale of the real property would not be included as an asset of Kaminski's estate, in which she has an interest as a one-third legatee of the estate. Testimony that is adverse to the pecuniary interests of the legatee is admissible. *In re Estate of Shanahan* (1978), 59 Ill. App. 3d 269, 272.

■ As to respondent's contention that Edmund Urban III, who had previously represented respondent in the chancery action, should have been disqualified, we find that the trial court did not err in refusing to disqualify counsel. Urban did not participate in the citation proceeding; he was merely an observer. Respondent points out that during the proceeding Urban retrieved the chancery court file for

the special administrator. This, however, could not be characterized as participating in the proceedings. Further, there is no evidence of communication of any confidential information. In fact, Urban, when questioned by the court as to his status as a bystander to this action, stated that "no confidential information was revealed with regard to that Chancery action." Respondent's argument fails with respect to this issue.

■■■ Finally, respondent contends that the trial court incorrectly imposed a constructive trust on the proceeds gained from the sale of the property. A constructive trust may be imposed due to breach of a fiduciary or confidential relationship. (*Metropulos v. Chicago Art Glass, Inc.* (1987), 156 Ill. App. 3d 727, 736.) As we previously decided, the trial court properly found that a confidential or fiduciary relationship existed between the parties and that respondent failed to rebut the presumption of undue influence. Under these circumstances, a constructive trust was properly imposed.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

JIGANTI, J., concurs.

PRESIDING JUSTICE McMORROW, dissenting:
I respectfully dissent because the evidence wholly fails to sustain the trial court's findings, relied upon by the majority. Indeed, the evidence strongly indicates that Kaminski and respondent entered into an agreement whereby respondent purchased the property in 1982 under specific terms; that between the time of sale and Kaminski's death, Sender made payments to Kaminski totalling $10,600; and that prior to the sale to him, Sender cared for the property and made repairs to it. I dissent because the record does not support the trial court's finding that the transaction between Kaminski and Sender was a "questionable transaction where an individual of confidential relationship took advantage of the decedent." The administrator failed to sustain his burden to present evidence to clearly and convincingly establish the existence of a fiduciary relationship between Sender and Kaminski or to support the administrator's allegations of undue influence or lack of mental capacity, as is required for the imposition of a constructive trust upon the property at issue. The evidence unequivocally showed that Kaminski was mentally competent at the time of the execution of the letter of direction transferring the property to

Sender and that there was no undue influence exerted upon him to execute that document.

A duly executed, acknowledged and delivered deed is presumed valid and binding. (*Chicago Land Clearance Comm'n v. Yablong* (1960), 20 Ill. 2d 204, 170 N.E.2d 145; *Heiligenstein v. Schlotterbeck* (1921), 300 Ill. 206.) To void a conveyance on the ground of undue influence, the complainant's evidence must show that the grantee exercised such dominance and control over the will of the grantor as to have deprived the grantor of his free agency and caused him to make a disposition of his property which he otherwise would not have made. *Kolze v. Fordtran* (1952), 412 Ill. 461, 107 N.E.2d 686; *Crawford v. Krebs* (1976), 40 Ill. App. 3d 568, 352 N.E.2d 76.

A fiduciary relationship exists where one party reposes special trust and confidence in another who accepts that trust and confidence and thereby gains superiority and influence over the subservient party. (*Chicago Land Clearance Comm'n v. Yablong*, 20 Ill. 2d 204, 170 N.E.2d 145; *In re Estate of Kieras* (1988), 167 Ill. App. 3d 275, 521 N.E.2d 263; *In re Estate of Shedrick* (1984), 122 Ill. App. 3d 861, 462 N.E.2d 581.) In such a relationship, the dominant party is bound to act in good faith and with due regard for the interests of the subservient party. *Kolze v. Fordtran*, 412 Ill. 461, 107 N.E.2d 686.

Where the fiduciary relationship does not exist as a matter of law as, for example, between an attorney and client, principal and agent or guardian and ward, the burden of proving the existence of such a relationship is on the party attempting to set aside the deed or conveyance on the basis of an abuse of a relationship which is fiduciary or confidential in nature. (*Klass v. Hallas* (1959), 16 Ill. 2d 161, 157 N.E.2d 261; *Kolze v. Fordtran*, 412 Ill. 461, 107 N.E.2d 686; *Stone v. Stone* (1950), 407 Ill. 66, 94 N.E.2d 55; *Kester v. Crilly* (1950), 405 Ill. 425, 91 N.E.2d 419; *Clark v. Clark* (1947), 398 Ill. 592, 76 N.E.2d 446; *In re Estate of Kieras*, 167 Ill. App. 3d 275, 521 N.E.2d 263.) It is a long-standing rule that a fiduciary relationship will be found only where the evidence is so clear and convincing and so strong, unequivocal and unmistakable as to lead to but one conclusion. (*Chicago Land Clearance Comm'n v. Yablong*, 20 Ill. 2d 204, 170 N.E.2d 145; *Maley v. Burns* (1955), 6 Ill. 2d 11, 126 N.E.2d 695; *Stewart v. Sunagel* (1946), 394 Ill. 209, 68 N.E.2d 268; *Dylbie v. Dylbie* (1945), 389 Ill. 326, 59 N.E.2d 657; *McGlaughlin v. Pickerel* (1943), 381 Ill. 574, 46 N.E.2d 368; *Bennett v. Hodge* (1940), 374 Ill. 326, 29 N.E.2d 524; *Johnson v. Lane* (1938), 369 Ill. 135; *In re Estate of Kieras*, 167 Ill. App. 3d 275, 521 N.E.2d 263; *In re Estate of Shedrick*, 122 Ill. App. 3d 861, 462 N.E.2d 581.) If the evidence is doubtful or capable of rea-

sonable explanation on theories other than a fiduciary relationship, it is not sufficient to support an order imposing a constructive trust. *McCrillis v. Utterback* (1947), 397 Ill. 550, 74 N.E.2d 682; *Winkelman v. Winkelman* (1923), 307 Ill. 249; *Baughman v. Baughman* (1918), 283 Ill. 55.

As the majority notes, factors to be considered in the determination of whether a fiduciary relationship exists include the degree of kinship, if any, disparity in age, health, mental condition, education and business experience, the extent to which the allegedly servient party entrusted his business or financial affairs to the other and the degree of trust and confidence placed in the dominant party. (*Kester v. Crilly*, 405 Ill. 425, 91 N.E.2d 419; *In re Estate of Kieras*, 167 Ill. App. 3d 275, 521 N.E.2d 263.) However, a close familial relationship, normal love, affection and trust or even favoritism of the grantee by the grantor are not themselves sufficient to establish a fiduciary relationship (*e.g., Bennett v. Hodge*, 374 Ill. 326, 29 N.E.2d 524; *Stewart v. Sunagel*, 394 Ill. 209, 68 N.E.2d 268; *Winkelman v. Winkelman* (1923), 307 Ill. 249; *In re Estate of Cohan* (1978), 59 Ill. App. 3d 963, 376 N.E.2d 628); nor do mere old age, physical infirmity, eccentricities, or even some impairment of the mental faculties of the grantor attendant to advanced age or physical ailments render a deed invalid (*e.g., McCrillis v. Utterback*, 397 Ill. 550, 74 N.E.2d 682; *McGlaughlin v. Pickerel* (1943), 381 Ill. 574, 46 N.E.2d 368; *Johnson v. Lane*, 369 Ill. 135) without a showing of domination and subservience resulting in a benefit to the grantee (*Maley v. Burns*, 6 Ill. 2d 11, 126 N.E.2d 695).

It is only after the party challenging the transaction has sustained his burden of proving the existence of a fiduciary relationship that a presumption of undue influence and unfairness arises and the burden shifts to the dominant party to go forward with evidence showing the fairness of the transaction. (*McFail v. Braden* (1960), 19 Ill. 2d 108, 166 N.E.2d 46; *Staude v. Heinlein* (1953), 414 Ill. 11, 110 N.E.2d 228; *Stone v. Stone*, 407 Ill. 66, 94 N.E.2d 55; *In re Estate of Shedrick*, 122 Ill. App. 3d 861, 462 N.E.2d 581; see also *Franciscan Sisters Health Care Corp. v. Dean* (1983), 95 Ill. 2d 452.) Conversely, where a fiduciary relationship is not proven by the required quantum of evidence, the burden remains upon the party seeking to set aside the transaction to prove by clear, cogent and positive evidence that the transaction resulted from actual fraud or undue influence. *Klass v. Hallas*, 16 Ill. 2d 161, 157 N.E.2d 261; *Kolze v. Fordtran*, 412 Ill. 461, 107 N.E.2d 686; *Bennett v. Hodge*, 374 Ill. 326, 29 N.E.2d 524; *Schlensky v. Schlensky* (1938), 369 Ill. 179; *Johnson v. Lane*, 369 Ill. 135.

In light of the stringent standards applicable in cases seeking the declaration of a constructive trust on sale proceeds based on an abuse of a fiduciary relationship, a detailed review of the evidence is necessary. The record shows the following.

Sender testified that he was 47 years old, a real estate broker with 25 years' experience and the godson, nephew and favorite relative of Kaminski. Kaminski was 71 years old, United States born and a high school graduate. Throughout his life Sender had been close with Kaminski and his Aunt Veronica, Kaminski's wife and his (Sender's) godmother. He and Kaminski often fished and sometimes travelled together, and he frequently helped Kaminski with things around the house.

In 1979, shortly after his retirement, Kaminski moved from the Kedvale property to live with his sister, Mary, in Indiana, where he resided until March 1982. Kaminski's decision to move to Indiana was due in large part to the memories the house invoked of Veronica, who had died in 1971 and for whom he continued to grieve. Between 1979 and 1982, Sender regularly checked on the Kedvale property, provided general maintenance and made several repairs to it. Through that period, however, Kaminski remained financially responsible for the property, making all payments for taxes, utilities, maintenance and repairs. While in Indiana, Kaminski continued, either alone or with some assistance from Mary, to manage his income and expenditures, as well as the filing of income tax returns. At some unspecified time in the past Kaminski had given $10,000 to Sender and had also named him as a joint tenant on one or more of his bank accounts. Sender and Kaminski did not have substantial contact during this period, and despite being a joint tenant on Kaminski's accounts, Sender did not make withdrawals from or otherwise exercise any control over them, nor was he involved in the management of any of Kaminski's financial affairs. He did not know with certainty either the sources or amount of Kaminski's monthly income although he "guessed" that Kaminski received approximately $2,000 in pension and social security benefits and knew of no financial problems.

Sender further testified, without contradiction, that in March 1982, Kaminski telephoned to ask that Sender pick him up from O'Hare Airport. Sender and his wife met Kaminski and took him to their home, where he stayed for the next three weeks. Upon his arrival, Kaminski explained that Mary and her son had driven him from Indiana to Mary's daughter's home in Colorado and then informed him that he could not return to live with them and made arrangements for his flight back to Chicago. According to Sender,

Kaminski was very hurt and angered by the actions of Mary and her family.

Within the next few days, Sender drove him to inspect the Kedvale property. While there, Kaminski stated that he did not want to move back to the house because of the memories it invoked; that he was tired of paying the bills for it; and that because Sender had taken care of the house and done so much for him over the years, he wanted him to have it. Kaminski produced a 1975 land trust agreement which designated Sender as the beneficiary upon Kaminski's death. Prior to that time, Sender did not know of the existence of the trust or its terms. Neither did Sender know, until his disposition in this case, that in 1978 Kaminski executed a change of beneficial ownership of the trust removing Sender's name from it. Sender did not respond to Kaminski's remarks because Kaminski had expressed his intent to leave the house to Sender on dozens of occasions since 1974 and because, at that time, he was more concerned about where Kaminski would live if not at the Kedvale house or Indiana. During the next three weeks, however, Kaminski repeatedly told Sender and his wife that he wanted him to have the house. On one occasion, Sender suggested that he sell the house for Kaminski, but Kaminski repeated his wish to give Sender the property. Sender reminded Kaminski of the financial gifts he had previously given to him and to his children, but Kaminski persisted. Finally, after several discussions, Sender proposed, and Kaminski agreed, that the transfer of the property would be in the form of a sale, the terms of which were that Sender would pay Kaminski at least $300 per month during his lifetime, up to a maximum of $40,000.

Following their agreement, they called Kaminski's widowed sister, Anna Zalesiak, and made arrangements for Kaminski to live with her in Michigan. Sender thereafter contacted his attorney to prepare the necessary transfer documents, but the attorney was unable to do so without information from the trust documents. Sender telephoned Kaminski, who advised him that the land trust was held by Drovers Bank & Trust and instructed him to obtain the necessary information from Drovers. Sender's attorney then prepared a letter of direction which Sender took to Michigan for Kaminski's signature. Sender explained that it was the document necessary for the transfer of the property to him and asked if Kaminski had any questions. Kaminski said it was "fine" and that "that's what I want to do." Sender then drove Kaminski to a local notary, who acknowledged his signature. Kaminski did not have an attorney review the document nor was an attorney present when he signed it. Upon his return to Chicago,

Sender took the letter of direction to Drovers and had a deed prepared. He then recorded the deed, at which time he paid $80 for State and county transfer taxes, an amount based on a $40,000 sales price.

Between June 1982 and Kaminski's death in March 1983, Sender sent varying amounts of money, totalling $10,600, to Kaminski in Michigan. Kaminski never called requesting more than $300, but Anna sometimes did. On one occasion she said that Kaminski needed money because he wanted to buy a fishing boat; however, Sender had no personal knowledge of how the money was being spent. Kaminski was aware of the sale of the Kedvale property; but he never demanded the proceeds of that sale. The testimony of Sender's wife, Pat, was essentially the same as Sender's regarding the events and conversations with Kaminski during the three weeks he spent with them.

Aside from Sender, who testified as an adverse witness as well as in his own behalf, the only witness presented by the administrator was Kaminski's sister, Anna. She testified that she was the executrix of his estate and the original petitioner in this cause. Sometime in early May 1982, in a conversation with Kaminski relative to the Kedvale property, Kaminski said that "when [Sender] sells the house, he should send the money to Michigan. [I] could use it." As to whether the house was to be a gift to Sender, Kaminski said, "s---, no. He's got enough." Kaminski also told her that he would not settle for less than $40,000 for it. According to Anna, Kaminski was of sound mind when he came to live with her and remained so until his death.

The evidence before the trial court also included Kaminski's will, executed in Michigan on December 30, 1982. By its terms, each of Kaminski's three sisters—Anna, Mary and Sender's mother, Sophie, who apparently died after Kaminski but prior to the institution of this action—was to receive a one-third share of his estate. In the event that any of the three predeceased him, the deceased sister's share was to go to Anna or her heirs. The will made no mention of the Kedvale property and left nothing to Sender. Kaminski died in March 1983.

The record also contains documents signed by Kaminski giving Anna his household goods and a man's one-carat diamond ring. Also in the record are pleadings and documents relating to a citation proceeding instituted by Sender's sister as an heir of Sophie against Anna as executor of the will. That petition alleged Anna's misappropriation of several estate assets. Although the entire record of that proceeding is not contained in the record, it appears from documents

which are included that certain of the assets claimed by Anna as well as certain of the bank withdrawals and expenditures listed on her final accounting were disallowed; that she was ultimately removed as executor of the will and that the special administrator who prosecuted this action was appointed in her stead.

The majority accurately notes that Sender was Kaminski's nephew, godson and favorite relative; that Kaminski had previously given money to Sender; and that there was a 24-year difference in their ages. However, as held by the authorities cited earlier, a close and affectionate familial relationship, including that of parent-child, or even proof of favoritism by the grantor for the grantee, is not tantamount to a fiduciary relationship.

The majority also states that Kaminski was in "failing health" and "emotionally distraught" over the death of his wife. My review of the record discloses almost no evidence concerning Kaminski's health at the time of the transfer. The only evidence on this subject was responses by Sender to the trial court's questioning. Sender stated that he thought, but had no direct knowledge, that Kaminski had prostate problems and, possibly, high blood pressure and blood sugar.

Even assuming the existence of these infirmities, there was no showing, as numerous cases previously cited require, that they so impaired Kaminski as to result in Sender's dominance over him. Further, evidence of Kaminski's travels, both by car and airplane, between four States, and evidence that Anna later advised Sender that Kaminski wanted to buy a boat to get around the lake tend to show that Kaminski was relatively able-bodied at the time of and for months after the transfer.

Similarly, while Sender himself testified that Kaminski still grieved for his wife, the record is devoid of evidence that he was so "distraught" by her death 11 years earlier that he was incapable of making independent decisions relating to his personal interests, a critical factor which must be proved where a fiduciary relationship is alleged. In my view, this evidence was supportive of Sender's explanation of Kaminski's decision to dispose of the Kedvale property.

Emphasis is also placed on the facts that Sender had been a real estate broker for 25 years; that Kaminski had retired from Crane Company; and that "there was no evidence presented that he had any experience in the real estate business." Initially, it is incumbent to keep in mind that the burden of proving a fiduciary relationship was on the administrator. Also, since the record does not disclose Kaminski's occupation, suppositions should not be made from his em-

ployment with Crane Company. There was, however, testimony that he was born in this country, that he was a high school graduate, and that he understood the effect and mechanics of land trusts.

Moreover, I do not agree with what appears to be the majority's conclusion that Sender's experience and Kaminski's relative inexperience in real estate matters created a dominant-subservient relationship. The question was not whether Sender was experienced in real estate matters, but whether by reason of his knowledge and experience he gained and exerted control over Kaminski with regard to the property at issue. There is no evidence of such control or influence in this record. Rather, the evidence established that Kaminski had not lived in the house or in Illinois since 1979; yet he continued to bear all of the financial burdens for the property. And it is conceded that Kaminski decided that memories of his wife prevented him from returning to the house but the financial burdens militated against keeping it.

It was uncontradicted that during Kaminski's three-year absence, Sender acted as sole caretaker for the property, personally performing such tasks as cleaning, painting, pumping out the basement when it flooded, boarding up and replacing windows broken by vandals, regular lawn maintenance and the like, that even when Kaminski lived in the house, Sender helped him with its upkeep, and that Kaminski was grateful to Sender for assuming those responsibilities.

It was also unrefuted that Kaminski had been expelled from Mary's home in Indiana, that he was hurt and angered by her actions, that when advised that he would not be allowed to return to Mary's home, it was Sender whom he called and Sender who picked him up and provided him with a temporary place to stay. Anna was given several items of personal property and was favored in Kaminski's will. Notwithstanding any ill feelings toward Mary, she was also included in Kaminski's will, whereas Sender who, it is agreed, was Kaminski's favorite relative, was left nothing under the terms of the will. Although it is true that in 1978, Kaminski retracted his 1975 designation of Sender as beneficiary of the land trust, the fact that Kaminski, without Sender's knowledge, had designated him the beneficiary in the first instance indicates that Kaminski had independently considered gifting the property to Sender long before the events at issue.

The only evidence contrary to Sender's assertions was Anna's testimony that Kaminski did not intend to gift the property to Sender because, as he told her, "[h]e's got enough." The significance of that testimony is questionable, however, in light of the fact that

Sender's position was that the transfer was not a gift but a sale under specific terms, *i.e.*, monthly payments of at least $300 to Kaminski during his lifetime and the documented evidence that in the 10 months between the transfer and Kaminski's death, Sender sent Kaminski amounts totalling $10,600.

Where the evidence is doubtful or capable of reasonable explanation on a theory other than the existence of a fiduciary relationship, as is the situation here, it will not sustain the declaration or enforcement of a constructive trust. (*E.g.*, *McCrillis v. Utterback* (1947), 397 Ill. 550, 74 N.E.2d 682.) In my view, the above-stated evidence provides a more reasonable explanation for Kaminski's decision to transfer the property to Sender than the mere disparity in their knowledge or experience in real estate matters.

I agree with the majority that the evidence showed that Kaminski named Sender as a joint tenant on some of his bank accounts. Indeed, the record as a whole shows Kaminski's trust in Sender. The nature and degree of trust necessary to create a fiduciary relationship, however, is not the normal trust placed by one family member in a relative with whom he has long enjoyed a close, affectionate relationship. (*E.g.*, *Winkelman v. Winkelman* (1923), 307 Ill. 249; *In re Estate of Shedrick* (1984), 122 Ill. App. 3d 861, 462 N.E.2d 581.) No evidence was presented that Sender acted as owner or exercised any control over the accounts on which he was a joint tenant. (See *Stewart v. Sunagel* (1946), 394 Ill. 209, 68 N.E.2d 268; *In re Estate of Kieras*, 167 Ill. App. 3d 275, 521 N.E.2d 263.) Nor was there evidence, as the majority states, that Sender and Kaminski discussed the latter's financial assets or affairs. To the contrary, in response to questions by the trial court, Sender expressly denied having any discussions relating to Kaminski's assets, except for the conversations concerning the property at issue immediately prior to Kaminski's move to Michigan.

There is no claim that Kaminski signed the letter of direction to Drovers Bank & Trust involuntarily. Therefore, the fact that an attorney was not present with Kaminski at the time of execution of the document relates only to the issue of whether he understood the nature and effect of the letter of direction. As noted earlier, evidence that he executed the documents placing the property in a land trust and was familiar with the procedures for changing beneficial ownership and, in fact, had previously done so, supports Sender's claim that Kaminski understood the nature and effect of signing the letter of direction. Further diminishing the significance of the absence of legal counsel and refuting any claim that Kaminski did not compre-

hend the effect of the trust document is the lack of any evidence that subsequent to the transfer Kaminski retained any incidents of ownership, sought to exercise control over the property, was unaware of or objected to its sale or had misgivings about or a desire to rescind the conveyance. See, *e.g., Chicago Land Clearance Comm'n v. Yablong*, 20 Ill. 2d 204, 170 N.E.2d 145.

In my opinion, this evidence falls far short of being so clear and convincing and so strong, unequivocal and unmistakable as to lead to no other conclusion but that a fiduciary relationship existed between Kaminski and Sender. Consequently, I do not believe that there arose a presumption of unfairness or undue influence which shifted the burden of going forward to Sender. However, it is also my view that he did not present sufficient evidence to rebut any such presumption.

Neither does the record support the finding that the transfer of the Kedvale property was procured by fraud or by reason of Kaminski's lack of mental capacity, one of which must be proved in the absence of a fiduciary relationship. As to mental capacity, the trial court stated, in its written ruling, that the initial issue in this case was whether Kaminski possessed the mental capacity to make a valid transfer of his property. The court's qualm was based on facts discovered and presented by the administrator near the close of the citation hearing regarding events subsequent to the transfer at issue which led to the filing of a declaratory judgment action by Chicago Federal Savings and Loan (the bank). It appears that in August 1982 an unidentified person presented a sight draft to withdraw the funds from a certificate of deposit of which Sender and Kaminski were joint tenants. The bank refused to honor it because neither the passbook nor proper affidavits asserting a lost passbook were submitted. On October 25, Sender directed the bank not to permit any withdrawals from the account and to pay future interest to him. As a result, in December 1982, the bank filed a complaint for interpleader and a determination of its responsibilities with respect to the account. In January 1983, Sender filed his verified answer and counterclaim, prepared by the attorney whose presence at the administrator's counsel table was objected to by Sender, in which he questioned whether the signature for withdrawal was actually Kaminski's and alleged that Kaminski was not mentally competent to execute the withdrawal document. Sender sought the appointment of a conservator and a judicial determination of Kaminski's competency; no such determination was ever made, however. On the basis of these facts, the trial court concluded that "[i]f the judicial admission by [Sender] under oath in the Chancery action are [*sic*] taken as true, then there is

some question as to the capacity of [Kaminski] to fully understand the mechanics of the transactions entered into of [sic] May of 1982."

As Sender correctly argues, and the majority recognizes, the test of a donor's mental capacity is "whether *at the time of the transaction*" he had the ability to understand the nature of the conveyance. (Emphasis in original.) (*In re Estate of Payton* (1979), 79 Ill. App. 3d 732, 739; *In re Estate of Clements* (1987), 152 Ill. App. 3d 890.) Additionally, the burden of showing that the grantor was mentally incapable of making a deed is on the party challenging the transfer. *Johnson v. Lane* (1938), 369 Ill. 135; *In re Estate of Clements*, 152 Ill. App. 3d 890.

Here, the administrator's statement in his brief that there was "no direct evidence of the state of mental capacity of *** [Kaminski] at the time of the execution of the documents in question" *concedes that he did not meet his burden* of showing lack of mental capacity. In any event, there was evidence on that issue. Not only did Sender and his wife testify that Kaminski was competent, but, as noted earlier, Anna, who instituted this proceeding against Sender, testified that Kaminski was of sound mind when he came to live with her in May 1982 and that he remained fully competent until his death. The record also discloses that Kaminski's will, executed on December 30, 1982, was admitted to probate without contest on his mental capacity to execute it. Therefore, in contrast to the majority's opinion, it is my view that the trial court's inclusion of its unsupported opinion of "questionable" capacity in its determination that the transaction at issue resulted from the abuse of a confidential relationship was improper, as it was both contrary to the manifest weight of the evidence and prejudicial to Sender.

Because it is my view that the administrator wholly failed to sustain his burden of proof on any of the theories necessary to sustain the imposition of a constructive trust, I would reverse the judgment of the trial court as being against the manifest weight of the evidence.