NANCY WHITE, as Ex'r of the Estate of Juel Clark, Deceased, Plaintiff-Appellee, v. TOMMIE RAINES, Defendant-Appellant.

Fifth District   No. 5—90—0173

Opinion filed June 20, 1991.

W.A. Armstrong, of Mitchell & Armstrong, Ltd., of Marion, for appellant.

Patrick J. Hewson and Edward J. Heller, both of Reed, Heller & Mansfield, of Murphysboro, for appellee.

JUSTICE LEWIS delivered the opinion of the court:

The plaintiff, Nancy White, as executor of the estate of Juel Clark, deceased, brought an action in two counts to recover assets from the defendant, Tommie Raines. She alleged in the first count that the defendant had exerted undue influence upon the decedent and in the second count that the decedent had lacked the mental capacity to conduct his affairs. Following a bench trial, judgment was entered in favor of the plaintiff and against the defendant as to count I, and the defendant was ordered to convey and transfer the property and accounts in question to the plaintiff. With respect to count II, the trial court expressly found that the plaintiff did not establish by a preponderance of the evidence that the decedent lacked mental capacity on the specific dates of the transfers of assets in question. Upon the trial court's denial of his post-trial motion, the defendant perfected this appeal, presenting two issues for our review: (1) "Was it error for the Trial Court to fail to apply the law to the facts, fail to consider all the evidence and make findings not supported by the evidence?" and (2) whether the trial court improperly applied the Dead Man's Act (Ill. Rev. Stat. 1989, ch. 110, par. 8—201) in ruling that the testimony of the defendant's wife was incompetent.

The decedent died testate on September 24, 1988, at the age of 88. His wife, Emma Clark, had died in August of 1987. The couple had had no children. On March 27, 1981, Juel Clark executed a will in which he devised and bequeathed all of his property to his wife if she should survive him and, if she should not, to 11 relatives, including his own *siblings*, his wife's siblings, and a number of his and Emma's nieces and *nephews*. *According to the terms of Juel Clark's will, the*

defendant, who is Emma Clark's nephew, was to receive 10% of the decedent's property after the payment of debts and funeral expenses.

Following Emma Clark's death, Juel Clark became despondent and his physical health deteriorated. He suffered from prostate problems and congestive heart failure. On a number of occasions beginning in November of 1987 until his death, he was required to be hospitalized, including the period from February 17, 1988, until March 9, 1988; from September 3, 1988, until September 8, 1988; and from September 23, 1988, until his death the following day. The defendant testified, in response to questioning by the trial court, that in March of 1988 he knew the contents of Juel Clark's will and that he knew then that he had not received the decedent's "Hill Farm," which he had hoped to receive. Earlier he had testified, concerning his knowledge of the contents of the will: "When we went to Steeleville in January I think I looked at it." He admitted in this earlier testimony that he had seen the will well before the decedent's hospitalization extending from February into March and well before the decedent's execution of both a power of attorney and a deed to Hill Farm in March of 1988. Asked by the trial court when he had become aware of the decedent's savings account and certificates of deposit, the defendant answered, "[P]robably March too." Cheryl Kimmel, the defendant's sister, testified that "probably" after the decedent's hospitalization in December of 1987 the defendant had told her that he knew the contents of the decedent's will.

In approximately January of 1988, the decedent executed a deed conveying Hill Farm, consisting of approximately 125 acres, to the defendant, who testified that he subsequently destroyed the deed:

> "Well, my uncle got upset after he had signed this and said everybody had got what they wanted and just take him home and let him die. So I got the deed out and I tore it up and I told him I didn't want his property, that I would rather for him to live."

On March 3, 1988, while in the hospital, the decedent executed a power of attorney granting to the defendant this power. Having obtained the document from the decedent's attorney, Donald Elmore, the defendant brought it to the decedent's hospital room where it was executed in the defendant's presence. Prior to this date the decedent had conveyed some of his real property to Lawrence White. Cheryl Kimmel testified that after the power of attorney had been executed, the defendant told her that it "was to take care of Uncle's business, to pay bills and to make sure there was no more land transactions."

After the decedent was discharged from the hospital on March 9, 1988, he came to live with the defendant and his family in Steeleville, Illinois. Upon questioning by the trial court, the defendant indicated that it was fair to say that from March to September of 1988, except for a period of five or six weeks around June when the defendant's son was in the hospital following an injury, defendant and his wife had essentially constant contact with the decedent, who no longer drove an automobile. On March 10, 1988, the defendant had his name "put on" the decedent's checking account. On March 19, 1988, the decedent executed a warranty deed conveying the Hill Farm to the defendant, who did not record the deed until September 27, 1988, three days after the decedent's death. The decedent signed the deed at the home of and in the presence of the defendant, who had asked a notary public whom he knew to come to his house for the purpose of notarizing the deed. The defendant had asked the decedent's attorney to prepare the deed and had obtained the deed from the attorney's office. Upon questioning by the trial court, the defendant indicated that he was the person who had instructed Mr. Elmore to prepare a deed to Hill Farm again and that the decedent had not communicated with Mr. Elmore concerning this deed, executed on March 19, 1988. The defendant paid no consideration for the deed.

The decedent resided with the defendant and his family until his death. At the end of the school year they lived together in the decedent's home in Sand Ridge, Illinois. On May 16, 1988, the decedent, a retired railroad employee, executed a "Designation and Change of Beneficiary Form" naming the defendant as the beneficiary of his employment-related insurance policy. The defendant had invited to his house a coemployee, David Jones, who witnessed the decedent's signing of this form. The defendant never sent the form or apparently made any claim with respect to these benefits, which have a value, according to the defendant, of $2,000.

On September 14, 1988, the defendant and the decedent engaged in a number of transactions that, together with the conveyance to defendant of Hill Farm in March of 1988, put the defendant in possession of virtually all of the decedent's assets of any value. The defendant testified twice concerning these transactions, first as an adverse witness called by the estate pursuant to section 2–1102 of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 2–1102) and second as a witness testifying in his own behalf.

As an adverse witness the defendant testified that on September 14, 1988, he and his wife had taken the decedent to the doctor and then proceeded to the office of the decedent's attorney in Murphys-

boro, Illinois. The defendant had "called ahead and had Mr. Elmore to fix up a deed for [the decedent's] house." The defendant testified that he "was told to" make the call. The defendant had instructed Mr. Elmore as to what he wanted done and, upon arriving at Mr. Elmore's office, went inside to pick up the deed while the decedent waited outside with defendant's wife in a pickup truck. The defendant indicated that two trips to Mr. Elmore's office were made that day because Mr. Elmore was not there the first time they went to his office. Apparently, upon returning to Mr. Elmore's office the defendant told personnel there that the decedent was too tired to come inside. For that reason and because "there was no parking," the notary public came outside to the pickup truck, where the decedent, in the presence of the defendant and his wife, signed the warranty deed conveying his home to the defendant. The decedent did not speak with or see Mr. Elmore that day. The defendant did not record the deed until after the decedent's death. To the knowledge of the defendant, the real estate so conveyed on September 14, 1988, comprised the remainder of the real estate owned by the decedent. Upon questioning by the trial court, the defendant indicated that although the deed to Hill Farm had originally been prepared in approximately December of 1987, the deed to this property had not been prepared at that time.

Defendant testified, upon further examination by the estate, that from the attorney's office he, his wife, and the decedent proceeded to the City National Bank in Murphysboro before returning to Mr. Elmore's office. With the decedent's three certificates of deposit and apparently his passbook in his pockets, the defendant, together with his wife, seems to have assisted the decedent in walking into the bank. The defendant "[p]robably" "pulled the C.D.'s and passbook out and put it [sic] on the counter." The defendant, not the decedent, explained to the teller what needed to be done. Asked, "Fact of the matter was he [decedent] was hunched over the counter, leaning on the counter to balance himself, wasn't he?" the defendant answered, "Could have been." Thereafter, the decedent and defendant's wife sat in the hall while the defendant discussed the transactions with bank personnel. The decedent signed the documents while seated. As a consequence of these transactions, the defendant's name was added to the decedent's certificates of deposit and savings account as an owner in joint tenancy. The value of the savings account at the time was, in the words of the defendant, "Fifteen, sixteen thousand. I'm not sure." The three certificates of deposit, in the amounts of $30,000, $19,000, and $17,000, had a combined value of $66,000. The defend-

ant told no one about these transactions until after the decedent's funeral.

The plaintiff's exhibit No. 6 consists of photographic copies of the three certificates of deposit. We note that, according to this exhibit, on April 14, 1988, City National Bank issued a certificate of deposit in the amount of $30,000 in the name of "Juel Clark or, Tommie D. Raines," which certificate replaced a prior one bearing the name of the decedent or Emma Clark and to which the name of the defendant had been added. On that same date, April 14, 1988, another certificate of deposit in the amount of $30,000, replacing the one in the name of "Juel Clark or Tommie D [sic] Raines," was issued in the name of "Tommie D. Raines or Harriet L. Raines." Harriet Raines is the name of the defendant's wife. Similarly, City National Bank issued a certificate of deposit in the amount of $19,000 on May 1, 1988, in the name of "Juel Clark or Tommie D. Raines," which certificate replaced an earlier one in the same amount bearing the names of the decedent and Emma Clark and to which the name of the defendant had been added. On that date, May 1, 1988, another certificate of deposit in the amount of $19,000, replacing the one in the name of "Juel Clark or Tommie D. Raines," was issued to the bank in the name of "Tommie D. Raines or Harriet Raines." Similarly, City National Bank issued a certificate of deposit in the amount of $17,000 on May 2, 1988, in the name of "Juel Clark or Tommie D. Raines," which certificate replaced an earlier one in the same amount bearing the names of the decedent and Emma Clark and to which the name of the defendant had been added. On that date, May 2, 1988, another certificate of deposit in the amount of $17,000, replacing the one in the name of "Juel Clark or Tommie D. Raines," was issued by the bank in the name of "Tommie D. Raines or Harriet L. Raines." Testifying in his own behalf, the defendant indicated that he had used the power of attorney only to write checks "to pay doctor bills" and that he had not transferred any of the decedent's property, real or personal, using his own name with or without a power of attorney: "Just the checks that we talked about this morning to pay doctor bills. That's all we ever done." Asked, "With a power of attorney did you ever transfer anything else or do anything else, gain some kind of right to control or use his property?" the defendant responded, "All we done was wrote the checks to pay the bills. I didn't transfer no property or nothing to my name. No, sir."

Testifying in his own behalf, the defendant stated that the decedent had not told him that he intended to give him the "other farm" and the money in the bank "until the day we done it," September 14,

1988. The defendant described how he learned of the decedent's intentions on that day:

> "We had a doctor's appointment that day. We took him to the doctor at Carbondale and on the way back through Murphysboro he said he wanted to stop at the bank and stop at Mr. Elmore's. So on the way back we stopped at Mr. Elmore's and he wasn't there, so from there we went to the City Bank. We went inside and done the transactions of the bank account, whatever."

The defendant testified that the decedent had not said to him on a previous occasion that he might give him this real property or money. Later, when the trial court inquired of the defendant, "[W]as it you that initiated the contact with Mr. Elmore regarding the deed to the homestead property?" he answered, "Probably so. I think." Asked by the trial court, "So Mr. Elmore got the instructions on September 14th deed from you, is that correct?" the defendant responded, "I guess so." Questioned by the trial court whether he knew when he had initiated the contact with Mr. Elmore concerning the deed executed on September 14, 1988, the defendant answered, "Not exactly." In response to further questioning by the trial court, the defendant indicated that he had done so before the decedent entered the hospital on September 3, 1988. Upon still further questioning by the trial court, the defendant testified that when they left on the morning of September 14, 1988, to go to the doctor's office, he did not know they were going to go to Mr. Elmore's office and to the bank.

Cheryl Kimmel, a beneficiary of 15% of the decedent's estate under his will, testified that during the hospitalization of the decedent in November 1987, the defendant stated in a discussion at which the witness and the decedent's doctor were present that he would never let the decedent go to a nursing home "[b]ecause he said they'd take everything he got," that is, "[e]verything that Uncle had" by way of property. During this hospitalization the defendant advised the witness that the decedent was not physically or mentally capable of handling his business affairs any longer, that the defendant felt that a power of attorney was necessary "[b]ecause Uncle Juel had made some land transactions," and that the defendant should be the grantee of the decedent's power of attorney "[b]ecause [defendant] said everybody was taking advantage of [decedent] and taking him for everything he had." After the decedent was discharged from the hospital in November of 1987, the defendant took care of him at his home in Steeleville.

Cheryl Kimmel testified that she knew that the decedent had a will and had seen it. She stated that during a visit in July of 1988 the defendant told her, "we should get Uncle to sign everything over to us," that is, to defendant and the witness, "so no one else could come in, that his side didn't deserve anything," namely, the decedent's nieces and nephews. She testified that she then told the defendant "Uncle had a will, to leave it just like it was and everybody would get a share." The defendant responded, "We'll see about that." The day after the decedent's funeral the defendant told her that decedent had signed everything over to him prior to his death. When the witness asked why decedent had done so, the defendant answered that he "deserved it." The defendant said, "nobody was going to get anything," and he told her that if she had played her cards right she would have been the one getting it all, not him. The witness testified that in approximately March of 1988 the defendant told her "that he had finally got Uncle to agree to sign the 130[-]acre farm over to him." The witness further testified that later, in April of 1988, the defendant told her concerning the conveyance of the farm that "Uncle Juel had went into a rage and told him he didn't want him to have it and so Tommie told me he tore the deed up." "Over the years," the witness said, the defendant had expressed the wish several times to have the Hill Farm "and build a log cabin on it."

Charlotte McMannis, the wife of Leon McMannis, who is Emma Clark's nephew and a beneficiary of 10% of the decedent's estate under his will, testified that she works in the office of the supervisor of assessments in Jackson County and that she saw the defendant in that office on two occasions in March of 1988, on March 7 and 14. On March 7 defendant had come in to check the deed that Lawrence White had received from the decedent and said that he was going to the decedent's attorney "to see if anything could be done about that deed." On March 14 the defendant said he came in to get a legal description because he had someone interested in buying the farm. The defendant also said he did not realize how easy it was to get in someone's accounts. The witness described defendant's statement: "You could go to the bank with a power of attorney, no questions asked." The defendant testified that he did not know of anyone who wanted to buy the Hill Farm in March of 1988.

The discovery deposition of Charles Johnson was admitted into evidence. The witness is the vice-president and cashier at City National Bank and had been acquainted with the decedent for over 20 years. He described the conversation he had had with the decedent on September 14, 1988, which lasted "[p]robably a minute":

"Just as a matter of operating procedure our girls normally bring any instruments of substantial amount to my attention. They brought these and said these were going to be changed, just a routine matter of procedure. They indicated they were going to go into joint tenancy with Juel and Tommie Rains [*sic*]. Juel was sitting in front of my desk and I asked him if he wanted these put into joint tenancy with Tommie and he said yes, and I asked him if he understood that if something happened to him that this money would become Tommie's, and he said yes. I said, 'Fine, that's all I need to know.'"

The defendant called as an adverse witness June Raines, who is his mother, the mother of Cheryl Kimmel, the decedent's sister-in-law, and a beneficiary of 10% of the decedent's estate under his will. She testified that in October of 1987 she had a conversation with the decedent concerning making a change in his will after Cheryl Kimmel had received benefits from his wife's insurance policy that, according to the witness, he felt he ought to have received. The witness had indicated that she did not think it was feasible for him to change his will at his age. The witness described the decedent's response: "'If I don't change my will,' he said, 'I can still sign my name and I'll change things before I die.'" Later, during the summer of 1988, he offered the witness his house, which she declined, and she suggested that he give it to his brother Jack. Again the witness related the decedent's response:

"'No. I've discussed this with Jack several times and he said he didn't want anything because it would just mess him up with his pension and his free help he got.' He said, 'I'll just sign it all over to Tom. He's always been here for us when we needed help.'"

The testimony of the defendant and of the decedent's attorney, Donald Elmore, given in a discovery deposition admitted into evidence, indicates that in approximately December of 1987, while discussing another matter, the decedent addressed with his attorney in the presence of the defendant the matter of a power of attorney and a deed to Hill Farm. The defendant had been assisting the decedent in a small claims matter in which the decedent had been defendant. Mr. Elmore stated that the last personal contact that he really remembered having with the decedent was around Christmas in 1987. Early in 1988 he had spoken on the telephone about the power of attorney and deeds with the decedent, who, he thought, had called him. He said that the last time he had spoken with the decedent on the telephone was sometime early in 1988, in January or February. Later he

indicated that it was possible that he had talked with the decedent "in the month or so" before the deed was executed in September of 1988, but the witness could recall only a conversation in February of 1988.

In an evidence deposition, Dr. Courtland Monroe, who began to treat the decedent on November 17, 1987, testified that the decedent's problems when he was hospitalized on September 3, 1988, were in large part affected by his "profound depression."

In its 12-page judgment, the trial court expressly found "[t]hat by virtue of the Power of Attorney as well as the trust and confidence that JUEL CLARK reposed in the Defendant, a fiduciary relationship existed between JUEL CLARK and the Defendant, TOMMIE D. RAINS." The court found further:

> "That when this Court considers the totality of the evidence; the fiduciary relationship, the physical and mental weakness of the decedent, his age, disease, depression, living arrangements, the dependence of the decedent on the Defendant, lack of independent counsel since January-February, 1988, and the circumstances surrounding the execution of the deeds and transfer of accounts, this Court finds that the Defendant, TOMMIE RAINS [sic], at the time of the transfers of assets exerted undue influence upon JUEL CLARK which caused JUEL CLARK to make dispositions of his property that was [sic] not his free and voluntary act."

The trial court stated as well that

> "[u]nder the circumstances herein, this Court finds that the Defendant breached his fiduciary duty in causing the bank accounts to be transferred into joint tenancy with himself and that the presumption of donative intent is effectively rebutted. This Court finds that JUEL CLARK lacked the donative intent to transfer said bank accounts by reason of the undue influence exerted by the Defendant, TOMMIE RAINS [sic]. Coupled with all the other surrounding circumstances and events since March, 1988, the Court finds that the executor has sustained the burden of proving by clear and convincing evidence that a gift was not intended by JUEL CLARK when he transferred his bank accounts into joint tenancy with the Defendant."

The trial court wrote:

> "The fact that none of the property in question was transferred pursuant to the Power of Attorney does not lessen the burden on Defendant to show by clear and convincing evidence that none of the transactions were the result of undue influence."

In his brief the defendant asserts with respect to the first issue presented for review that the trial court imposed a greater burden on the defendant in this case than is required by law and, in effect, required him "to disprove some kind of presumption that exists apart from evidence giving rise to the presumption and its reasonable inferences." The defendant maintains that

> "[t]he Court has misconstrued and misapplied the law of the State of Illinois and the concept of fiduciary relationships and the presumption of undue influence in such a way as to alter the burden of proof and improperly change the focus of evidence from a determination of the free will and agency of transferor based upon intention and conduct of the transferor and toward the knowledge of or physical presence of the transferor."

A power of attorney gives rise to a general fiduciary relationship between the grantor of the power and the grantee as a matter of law. (*Lemp v. Hauptmann* (1988), 170 Ill. App. 3d 753, 525 N.E.2d 203.) Once the petitioner has shown that a fiduciary relationship exists, the presumption is that a transaction between the dominant and servient parties which profits the dominant party is fraudulent. (*Lemp v. Hauptmann* (1988), 170 Ill. App. 3d 753, 525 N.E.2d 203.) The dominant party then has the burden of proving by clear and convincing evidence that the transaction was fair and equitable and did not result from his undue influence over the servient party. *Lemp v. Hauptmann* (1988), 170 Ill. App. 3d 753, 525 N.E.2d 203.

The transactions between the defendant and the decedent occurred after the grant of the power of attorney by the decedent to the defendant on March 3, 1988, and the termination of that power upon the death of the decedent on September 24, 1988. Therefore, the presumption is that the transactions are fraudulent because of the fiduciary relationship between decedent and defendant. Thus, the defendant has the burden of proving by clear and convincing evidence that the transactions were fair and equitable to the decedent and that the transactions did not result from his undue influence over the decedent.

The creation of a joint tenancy account gives rise to the presumption that a gift to the surviving joint tenant is intended. (*In re Estate of Clements* (1987), 152 Ill. App. 3d 890, 505 N.E.2d 7.) To rebut this presumption, the party contesting the transfer must establish by clear and convincing evidence that a gift was not intended. (*In re Estate of Clements* (1987), 152 Ill. App. 3d 890, 505 N.E.2d 7.) Clear and convincing evidence is that which leaves no reasonable doubt in

the mind of the trier of fact as to the truth of the proposition in question. *In re Estate of Clements* (1987), 152 Ill. App. 3d 890, 505 N.E.2d 7.

■ In the instant case, the trial court found that the executor has sustained the burden of proving by clear and convincing evidence that a gift was not intended by the decedent when he transferred his savings account and certificates of deposit into joint tenancy with the defendant. The trial court indicated further that the defendant's burden, in view of the fiduciary duty imposed by the grant of the power of attorney to him, was to show that none of the transactions were the result of undue influence. The record here is replete with evidence showing that the plaintiff met her burden of proof, whereas the defendant failed to meet his.

The findings of the trial court are not to be disturbed unless they are against the manifest weight of the evidence. (*In re Estate of Kaminski* (1990), 200 Ill. App. 3d 309, 558 N.E.2d 142.) The trial court is in the best position to make a determination as to the credibility of witnesses and the weight to be afforded testimony. (*In re Estate of Kaminski* (1990), 200 Ill. App. 3d 309, 558 N.E.2d 142.) In light of the record before us, the findings of the trial court in its carefully considered judgment may hardly be said to be against the manifest weight of the evidence and, hence, may not be disturbed.

■ With regard to the other issue defendant raises for review, he contends that the trial court improperly excluded as incompetent, pursuant to the Dead Man's Act, the testimony of his wife, Harriet Raines. He does not urge that the exclusion of her testimony resulted in prejudice to him. A party is not entitled to reversal based on rulings on evidence unless the error was substantially prejudicial and affected the outcome of the trial. (*Cairns v. Hansen* (1988), 170 Ill. App. 3d 505, 524 N.E.2d 939.) The burden is on the party seeking reversal to establish prejudice. (*Cairns v. Hansen* (1988), 170 Ill. App. 3d 505, 524 N.E.2d 939.) The instant defendant has failed to assert, much less to demonstrate or to establish, prejudice as a result of this exclusion. It is within the trial court's discretion to determine whether such testimony is necessary to a full and fair presentation of the facts of the case. (*In re Estate of Kaminski* (1990), 200 Ill. App. 3d 309, 558 N.E.2d 142.) There has been no showing that the trial court abused its discretion in this regard.

Affirmed.

RARICK, P.J., and CHAPMAN, J., concur.