(No. 26917.—

EMMA McGLAUGHLIN *et al.*, Appellants, *vs.* LUELLA PICKEREL, Appellee.

*Opinion filed January 19, 1943.*

EAGLE & EAGLE, for appellants.

JOHNSTON, RAILSBACK & BOZEMAN, for appellee.

Mr. JUSTICE MURPHY delivered the opinion of the court:

This appeal is prosecuted to reverse a decree of the circuit court of Rock Island county which dismissed plaintiffs' complaint for want of equity. On February 25, 1941, Hiley Peck executed and delivered a deed to defendant, Luella Pickerel, conveying to her a certain residence property located in the city of Rock Island. The deed reserved a life estate to the grantor. On March 9, 1941, Hiley Peck died intestate, leaving plaintiffs, except as to the administrator, her heirs-at-law. They instituted this suit charging that Hiley Peck was mentally incapable to make the deed and that it was the result of undue influence exercised by the defendant. Reference was also made to a transfer of personal property. The cause was referred to a master in chancery to take the evidence and report his conclusions. He reported, finding against plaintiffs on the charges of mental incapacity and undue influence and recommended that a decree be entered dismissing the complaint for want of equity. The report and recommendation were approved and a decree entered.

Hiley Peck's husband and two children died several years prior to her death. At the time of her death she was 71 years of age. Her heirs-at-law are a sister who resides in Washington, a brother at Keota, Iowa, and certain nieces and nephews whose residences are not shown. The defendant, a niece by marriage, being a niece of the grantor's deceased husband, resides in Davenport, Iowa.

The lot in question was improved with a dwelling house and was worth about $4000, with $600 unpaid taxes against it. The grantor divided the house into apartments, reserving a room or two for her own use, where she lived alone. The other apartments she rented, receiving a gross

monthly rental of $50. In August, 1940, she sold another lot or lots, negotiating the terms of the contract herself, and caused papers to be drafted covering the transaction. There is some intimation in the evidence that such contract has not been fully executed but the details of the contract or what the deceased did with it after its execution do not appear in the evidence.

The deceased transacted all her own business affairs which consisted chiefly of the rental of the apartments, the sale of the lot and the purchase of supplies for her house and her personal use. It is evident she did not exercise the best of judgment in the use of her money and as a result had creditors whose claims she could not pay. She was often without funds and, her credit being impaired, she was forced to borrow small amounts from friends or have the tenants make advancements on the rents. Plaintiffs introduced evidence which shows that in 1938 and 1939 she delivered receipts to the tenants for rent without first receiving the money. These acts were only occasional and were so remote from the time the deed was executed that they do not throw much light on the issue as to her mental capacity. It also appears that at various times she complained of the tenants' steady use of her washing machine, when as a fact their use was for a very short time each week. She became disgruntled at her tenants over what appears to be trivial matters and in some instances terminated their tenancies. There is evidence that she thought that if she would notify the local newspaper of her trouble with the tenants, it would oust them without further action on her part.

The evidence shows she had high blood pressure and, at times covering a period of several months prior to her death, was forgetful, had hallucinations and was in a stage of senile dementia. A member of her Sunday-school class, who had known her for years, was called by plaintiffs and testified to an incident where the deceased wanted to go

to her home but got on a bus going in the opposite direction, and on another occasion did not recognize her. These incidents were the basis of her opinion that she was mentally incompetent. Other witnesses testified to occasions when she thought her neighbors were poisoning the food they were sending her and at other times she thought she was in the presence of her daughter who was then deceased.

Thirteen witnesses called by the plaintiffs expressed the opinion that Hiley Peck was not mentally competent to execute the deed. Eight other witnesses called by defendant were of the opinion that she had sufficient mental capacity to make the deed. One of the witnesses called by plaintiff was an attorney and testified that he was employed by Mrs. Peck to draft the contracts in reference to the disposal of the lot sold in August, 1940. He testified that at that time she was mentally capable of transacting business but when she came to his office in January, 1941, in his opinion her mind was so impaired as to render her incompetent to make a deed. His secretary, who was present when Mrs. Peck was there in January, testified that her conversation was incoherent and irrational. On the other hand, the attorney called by the defendant testified that on the day the deed was executed, an attorney of Davenport, Iowa, whom he had known for some time and who had represented the defendant in other matters, phoned him to go to Mrs. Peck's home to prepare a deed or will. He testified that he had not previously known the defendant or Mrs. Peck and that when he arrived at the home the defendant met him at the door and introduced him to Mrs. Peck; that defendant then withdrew and was not present during any of the conversation he had with Mrs. Peck or when the deed was signed. He testified that he explained to Mrs. Peck the difference between a deed and a will and after full discussion as to the property she had, she asked him to prepare a deed. He asked Mrs. Peck for a legal description of the property and she searched through

various papers but was unable to find it. He stated that she was able to recall the lot or block numbers, which was sufficient to obtain the full description from the records without other aid. She told him of the kindness defendant had shown her and that she wanted the property to go to her.

Plaintiffs introduced the evidence of two doctors, Dr. Barding, who was Mrs. Peck's attending physician for a number of years, and Dr. Belyea, who testified to the symptoms and effect of senile dementia. Dr. Barding saw Mrs. Peck at her home on February 23 and testified that at that time she was suffering from high blood pressure and senile dementia, an ailment which she had been afflicted with for about six months. In his opinion she was not mentally capable of transacting ordinary business affairs. On cross-examination, he stated that in senile dementia the condition of the patient might vary from day to day and that there might be periods in which the patient would appear rational. He refused to express an opinion as to her mental capacity on the date the deed was drawn, February 25, 1941, and limited his conclusion to her condition when he saw her on February 23. He testified that he saw her again on March 3, but at that time she was suffering from a brain hemorrhage from which she died five days later. Dr. Belyea testified that senile dementia was a progressive disease and that its symptoms were forgetfulness, delusions of persecution and hallucinations. He testified on cross-examination that there are various stages of the disease and that the degree of sensibility of the patient would depend on how far the disease had advanced, that there were temporary periods of improvement and that although such persons might be classed as being afflicted with senile dementia, it would not necessarily mean that they were insane and could not transact ordinary business, it depending entirely upon the stage of development of the ailment. He said it was a term used to describe mental

senility ranging from mere forgetfulness to incoherent insanity.

Enough of the evidence has been stated to show that there is a conflict on the question of mental capacity. The period covered by the evidence of some of the witnesses for the plaintiffs, and which formed the basis of their opinion of mental incompetency, was more remote from the period immediately prior to the execution of the deed than was the period covered by some of the witnesses who testified she was mentally competent. This was a circumstance supporting the conclusions the master drew from the evidence.

The test of mental capacity to make a deed is that the grantor must have sufficient mind and memory to comprehend the nature and effect of his act, and if he is able to understand the nature and effect of the business in which he is engaged and is exercising his own will, his deed is valid. (*Essary* v. *Marvel*, 274 Ill. 576; *Kelly* v. *Nusbaum*, 244 id. 158; *Perry* v. *Pearson*, 135 id. 218; *English* v. *Porter*, 109 id. 285; *Willemin* v. *Dunn*, 93 id. 511; *Titcomb* v. *Vantyle*, 84 id. 371.) That he has such capacity may be shown by proof that he is capable of transacting ordinary business affairs wherein his interest is involved. (*Ring* v. *Lawless*, 190 Ill. 520; *Greene* v. *Maxwell*, 251 id. 335.) The mental capacity required to sustain the validity of a deed is of a higher degree than that required to enable a testator to make a will. For the latter purpose it is sufficient for the testator to understand the business in which he is engaged, his property, the natural objects of his bounty and the disposition he desires to make of his property. One may be capable of making a will, yet incapable of disposing of his property by contract or of managing his estate. (*Greene* v. *Greene*, 145 Ill. 264.) In the instant case, it is admitted that the deed given by Mrs. Peck to Mrs. Pickerel was without valuable consideration. The rule is that no greater mental capacity is required to make

a deed of voluntary settlement reserving a life estate than is required to make a will. *Harrington* v. *Travis,* 349 Ill. 606; *Sharkey* v. *Sisson,* 310 id. 98.

Proof of such matters as old age, eccentricities, or even partial impairment of mental faculties is not sufficient to set aside a deed where it is shown that the grantor still retained sufficient mental capacity to comprehend the nature of the transaction and protect his own interests. (*Bordner* v. *Kelso,* 293 Ill. 175; *Harrington* v. *Travis, supra.*) The fact that a deed made under the circumstances shown deprives certain blood relatives and heirs-at-law of the property is not ground for setting it aside unless the discrimination and prejudice can be explained on no other ground than that of an insane delusion, (*Johnson* v. *Lane,* 369 Ill. 135; *Noone* v. *Olehy,* 297 id. 160; *Carnahan* v. *Hamilton,* 265 id. 508,) and there is no evidence in this record indicating that the deceased suffered from such a delusion. A grantor may be subject to delusions but if they exert no influence on him in the making of the deed he will not be deemed incapacitated on that account to make a valid deed. *Essary* v. *Marvel, supra; Crosby* v. *Dorward,* 248 Ill. 471.

There is no evidence of undue influence. The defendant was present at Mrs. Peck's home at the time the deed was prepared but she was not in the presence of the grantor at any time during the preparation or execution of the deed and there is nothing to show she made any suggestion or took any part in having it executed. Under such circumstances there was no presumption arising that undue influence was exercised. There is undisputed evidence that the defendant's kindness to Mrs. Peck had extended over a period of time and that defendant had her come to her home in Davenport to visit, that she sewed for her, cared for her when ill and after the deed was prepared she took her to her home to care for her during her last illness. If further explanation for the deeding of the property to defendant was necessary it could be found in the intima-

tions in the evidence that Mrs. Peck thought her sister had made a misrepresentation to prevent her visiting her and that she thought her brother had ample property of his own.

It was the master's province in the first instance to determine the issue of mental capacity and undue influence and while his finding of facts does not carry the same weight as the verdict of a jury, or the finding of a chancellor where the evidence has been taken before the court, yet his findings are entitled to due weight on review of the cause. (*Keuper* v. *Mette,* 239 Ill. 586.) Where his conclusions as to the facts have been approved by the chancellor this court would not be justified in disturbing them unless it appears they are manifestly against the weight of the evidence. *Mruk* v. *Mruk,* 379 Ill. 394; *Pasedach* v. *Auw,* 364 id. 491; *Klekamp* v. *Klekamp,* 275 id. 98.

After the evidence had been heard and the master made his report, plaintiffs applied to the court for leave to amend their complaint to set up facts which they claimed would establish a confidential relationship between the defendant and Mrs. Peck. The rule is that the allowance of material amendments after the evidence has been closed is a matter largely in the discretion of the chancellor. (*Noll* v. *Peterson,* 338 Ill. 552; *Village of Averyville* v. *City of Peoria,* 335 id. 106; *Soltysik* v. *Soltysik,* 317 id. 247,) and such discretion will not be disturbed on review except in cases of clear abuse.

Reference is made to subparagraph (1) of section 46 of the Civil Practice Act (Ill. Rev. Stat. 1941, chap. 110, par. 170,) which provides that amendments may be allowed at any time before judgment in a civil action on such terms as are just and reasonable, and subparagraph (3) of that section provides that a pleading may be amended at any time before or after judgment to conform the pleadings to the proof. In applying this statute the courts are liberal in the allowance of amendments to the end that justice may be done, but the materiality of such an amendment to

the evidence already introduced must be apparent. Plaintiffs' motion to amend is not a question of conforming the pleading to the proof, for the facts alleged in the proposed amendment do not show the existence of a fiduciary relationship between the defendant and Mrs. Peck, nor does the evidence show such a relationship. The evidence that Mrs. Peck visited in defendant's home, waited on her when ill and did other errands for her, is not sufficient to establish the existence of a fiduciary relationship. The burden of proving facts from which a confidential relationship would arise was on the plaintiffs and to establish it by parol evidence the proof must be clear, convincing and so strong, unequivocal and unmistakable as to lead to but one conclusion. (*Johnson* v. *Lane, supra; Neagle* v. *McMullen,* 334 Ill. 168.) There was no error in denying plaintiff's motion for leave to amend the complaint.

The plaintiffs contend it was error for the court to deny their motion to reopen the cause and hear further evidence. On July 14, 1942, more than a month after the hearing on exceptions to the master's report, plaintiffs asked leave to open the cause for the introduction of further evidence. The basis of the motion as set up in the affidavit of plaintiffs' counsel was that several witnesses, persons who lived in the same neighborhood with Hiley Peck, would, if called, testify to certain facts tending to sustain the claim of mental incapacity and that a certain physician would testify to certain facts and express an opinion that she was not mentally competent to make the deed. The motion was denied on the ground that there was no showing of due diligence. The order of the introduction of evidence rests in the sound discretion of the trial court and the exercise of it will not be interfered with except for clear abuse. (*Brelsford* v. *Community High School District,* 328 Ill. 27; *People ex rel. Boos* v. *St. Louis Iron Mountain and Southern Railway Co.* 278 id. 25.) The showing of diligence was insufficient to justify a reopening of the cause for further evidence.

Furthermore, the ruling of the court can well be sustained on the ground that the alleged newly discovered evidence was cumulative of evidence already in the record and there was no showing that the new witnesses possessed any especial advantage or opportunity of observing Mrs. Peck that would entitle their opinions to any special weight.

Plaintiffs' final contention relates to the court's ruling in reference to the personal property. In plaintiffs' complaint it was alleged that, at the time the deed was made, Hiley Peck conveyed to defendant "by bill of sale or otherwise household goods and other personal property." It was alleged that such transfer should be set aside on account of undue influence and mental incapacity and prayed that the property be returned to the administrator, or, if it had been disposed of, that defendant be required to account for its value. In addition to denying all allegations of undue influence and mental incapacity, defendant answered denying that there was any conveyance or transfer of the household goods or other personal property and disclaimed any interest in any of the personal property that belonged to the estate. As affirmative matter it was alleged that the household goods and other personal property belonging to Mrs. Peck at her death had been sold under the directions of the defendant, that notice of such sale had been given to plaintiffs and that the entire proceeds from the sale had been paid to the administrator of the estate. Plaintiffs' reply denied such notice had been given and also denied that the entire proceeds from the sale were delivered to the administrator. Plaintiffs did not introduce any evidence tending to show that there was a transfer of personal property made at the time the deed was executed. They confined their evidence to the issues on mental incapacity and undue influence. Furthermore, plaintiffs did not show what personal property they claimed to have been the subject of the transfer. In this condition of the record, there was nothing upon which the master

could base a specific finding and his recommendation that the complaint be dismissed for want of equity disposed of all questions raised by the pleadings in regard to the personal property. The chancellor did not err in sustaining the report of the master without requiring a specific finding as to the personal property, for there is no evidence upon which a finding of fact could be based.

The decree of the circuit court was correct and is affirmed.

*Decree affirmed.*