NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 210057-U

NO. 4-21-0057

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 14, 2021
Carla Bender
4th District Appellate
Court, IL

| | |
|---|---|
| LINDA TAYLOR, as Independent Executor of the Estate of Floyd Dodson, Deceased,          Plaintiff-Appellant,          v. UDI #4, LLC, d/b/a LEROY MANOR; LEROY SOUTH BUCK, LLC; UNLIMITED DEVELOPMENT, INC., an Illinois Not-For-Profit Corporation; BEKIME FEEZOR-BRANCH, RN; and NASHIRA BROWN, LPN,          Defendants-Appellees. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Appeal from the Circuit Court of McLean County No. 19L161 Honorable Paul G. Lawrence, Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Cavanagh and Harris concurred in the judgment.

**ORDER**

¶ 1   *Held:*   The appellate court affirmed the trial court's grant of defendants' motion to dismiss and compel arbitration because (1) the health care power of attorney was valid and (2) the arbitration agreement was not unconscionable.

¶ 2           In November 2019, Linda Taylor, as independent executor of Floyd Dodson's estate, filed a complaint against defendants, UDI #4, LLC, d/b/a Leroy Manor (Leroy Manor); Leroy South Buck, LLC; Unlimited Development, Inc.; Bekime Feezor-Branch, RN; and Nashira Brown, LPN (hereinafter collectively referred to as "defendants"), alleging defendants provided negligent nursing home care to Floyd Dodson, which resulted in his death.

¶ 3           In April 2020, defendants filed a motion to dismiss and compel arbitration, asserting that when Floyd was admitted to Leroy Manor, he and his son, Jack Dodson, signed a

nursing home contract and arbitration agreement that required some of Taylor's claims to be submitted to arbitration. Taylor responded that the motion should be denied because (1) Floyd lacked the capacity to contract when he signed the admissions paperwork and (2) the arbitration agreement was substantively and procedurally unconscionable. Following a December 2020 hearing, the trial court granted the motion.

¶ 4    Taylor appeals, arguing the trial court erred by compelling arbitration. We disagree and affirm.

¶ 5                          I. BACKGROUND

¶ 6                          A. The Complaint

¶ 7    In November 2019, Linda Taylor filed a complaint against defendants, alleging they provided negligent care for Floyd Dodson. The complaint contained a total of 11 counts against defendants, asserting claims under the Illinois Nursing Home Care Act (210 ILCS 45/3-714 (West 2018)), the Illinois Survival Act (755 ILCS 5/27-6 (West 2018)), and the Wrongful Death Act (740 ILCS 180/1 *et seq.* (West 2018)).

¶ 8    The complaint alleged that on August 22, 2018, Floyd became a resident at Leroy Manor, a long-term care facility. Defendants were aware Floyd was a fall risk. Floyd needed help engaging in daily activities such as walking, eating, and dressing. On September 30, 2018, Floyd suffered a fall that resulted in substantial injuries, including a subdural hematoma and an orbital fracture. Floyd died on October 8, 2018. Taylor was appointed as the independent executor of Floyd's estate. Taylor alleged defendants provided negligent care before and after the fall, which resulted in Floyd's death.

¶ 9                          B. The Motion To Dismiss and Related Proceedings

¶ 10                          1. *The Defendants' Motion*

- 2 -

¶ 11        In April 2020, defendants filed a section 2-619(a)(9) (735 ILCS 5/2-619(a)(9) (West 2018)) motion to dismiss and compel arbitration as to the Nursing Home Care Act and Survival Act counts in the complaint. Defendants argued that Floyd and Jack Dodson, his son and legal representative, entered into a valid and enforceable arbitration agreement.

¶ 12        In support of their motion, defendants submitted the affidavit of Erin Murray. She averred that she was the admissions director for Leroy Manner on August 22, 2018, the day that Floyd was admitted, and led new residents and their families through the admissions paperwork and process. Murray explained that pursuant to her standard practices, she would discuss the nursing home contract and arbitration agreement with residents and "representatives of residents." Murray's affidavit stated the following:

> "I would inform a new resident and potentially, a resident's representative, that, in the event of any dispute or legal action taken by either the resident or Leroy Manor, the dispute or legal action would need to be submitted to arbitration. I would explain to a new resident or a resident's representative that, in the event the resident pursues legal action relating to the skilled nursing services provided by Leroy Manor, the dispute and/or legal action would be submitted to arbitration, per the terms of the arbitration agreement."

Murray further explained that when arbitration began, each side would choose an arbitrator and those two arbitrators would jointly select a third. Murray said her "discussion with each new resident and/or the resident's representative on the terms and meaning of the arbitration agreement was always part of the admissions process, as of August 2018." Murray averred that she followed her standard practice on August 22, 2018.

¶ 13        The defendants attached to Murray's affidavit a copy of the nursing home contract

and arbitration agreement. Both documents were signed by Floyd and Jack. Jack signed the nursing home contract in the location marked for "representative(s)." Three lines above Jack's signature, boxes labeled "health care power of attorney" and "financial power of attorney" were marked with an "X," apparently signifying he was signing in that capacity. The arbitration agreement was a separate two-page document, double spaced, written in italicized font. The relevant portion stated the following:

"Without limiting any rights set forth in other provisions of this AGREEMENT, any and all disputes arising hereunder shall be submitted to binding arbitration and not to a court for determination. Arbitration shall commence after written notice is given from either party to the other, such arbitration shall be accomplished expeditiously in the county and state where the property which is the subject of this AGREEMENT is located, and shall be conducted in accordance with the rules of the American Arbitration Association ("AAA"). The arbitration shall be conducted by three (3) arbitrators, one of whom shall be appointed by FACILITY and one whom shall be appointed by RESIDENT. The third arbitrator shall be appointed by the first two arbitrators. The arbitrator shall be selected from a list of arbitrators submitted by the AAA. Judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof. Arbitration shall not commence until the party requesting it has deposited one thousand five hundred and No/100 U.S. Dollars ($1,500.00) with the arbitrators as a retainer for the arbitrators' fees and costs. The party requesting arbitration shall advance such sums as are required from time to time by the arbitrators to pay the arbitrators' fees and costs, until the prevailing party is determined or the parties have agreed in

- 4 -

writing to an alternate allocation of fees and costs. Each party shall pay its own legal fees and costs and any other fees incurred in connection with an arbitration proceeding which arises out of or relates in any way to this AGREEMENT; provided, however, that the arbitration panel shall award the arbitrators' fees and costs to the prevailing party in its arbitration judgment."

The second paragraph of the agreement stated that, in the event that a court determined the dispute was not subject to arbitration, the parties agreed to (1) waive the right to a jury and proceed to a bench trial and (2) the prevailing party would be entitled to recover "all costs incurred, including reasonable attorney's fees and costs, whether incurred before trial, at trial, in bankruptcy proceedings, or on appeal."

¶ 14                                      2. *Taylor's Response*

¶ 15        The parties engaged in discovery related to the arbitration agreement. In October 2020, Taylor filed a response to defendant's motion to dismiss in which she argued that the agreement was invalid because (1) Floyd lacked the capacity to contract and (2) Jack never acted as Floyd's health care agent under a power of attorney. Alternatively, Taylor asserted that the agreement was unenforceable because it was substantively and procedurally unconscionable and against public policy.

¶ 16        Jack and Taylor submitted affidavits in support of the response. Jack stated that he drove Floyd to Leroy Manor on August 22, 2018. Jack and Floyd first went to a residential room before Jack left and went to a different room to sign admissions paperwork. Jack stated he signed the admission documents for Floyd, believing he had to do so for his father to be admitted to the facility. Jack also said his father never authorized Jack to sign anything on his behalf. Jack stated that no one explained the arbitration agreement to him or the rights he was giving up and had

someone done so, he would have refused to sign and taken his father elsewhere for care.

¶ 17    Jack further stated he was never designated as Floyd's health care agent pursuant to a power of attorney, he was never told Floyd had to sign or did sign a power of attorney, and he never saw Floyd sign anything that day. Jack stated that Floyd (1) could not read, (2) had an eighth-grade education, (3) could not speak, and (4) in Jack's opinion, "had my father been presented with any documents at the time of his admission ***, I do not believe that he would have been able to understand the documents."

¶ 18    Taylor's affidavit averred that (1) she was present for the signing of the admission documents, (2) Floyd was not present, nor did Taylor see him sign anything that day, (3) Floyd could not read, (4) Jack was never authorized to act on Floyd's behalf under a power of attorney, (5) no one explained the terms of the arbitration agreement, and (6) had someone done so, she would have advised against signing it.

¶ 19    Regarding unconscionability, Taylor claimed in her response that the agreement was substantively unconscionable because it waived several statutory rights contained in the Nursing Home Act, including a plaintiff's right to attorney fees upon recovery and a jury trial. The agreement was procedurally unconscionable because (1) it was never explained to Jack, (2) he was not informed he could change the terms or consult an attorney, and (3) signing was a condition of admission. Further, Taylor stated that Murray admitted in her deposition that she did not understand the legal significance of the arbitration provisions and could not answer any questions about them.

¶ 20                    3. *Murray's Deposition*

¶ 21    In further support of her opposition to the motion to dismiss, Taylor presented a copy of Murray's deposition. Murray testified that she was the admissions director for Leroy

Manor since 2013. As part of her position, she "would facilitate with the hospitals and the families getting the new resident to the building and then completing all the admission work upon their arrival." Murray testified that the admissions paperwork was provided to the resident and her family in a folder. The resident would generally be present while signing; however, if a physician had determined the resident was incapable of signing, then just the family might be present. If a resident was coming from a hospital, documentation of incompetency would be included. Murray stated such paperwork was reviewed by Leroy Manor and herself prior to determining if Leroy Manor could accept the resident. If Murray ever had a question about someone's competency, she would contact the hospital or treating physician. Murray stated only a physician could declare someone incompetent. Murray estimated that she went over admissions paperwork with new residents between 15 and 30 times per month on average. Murray stated she discussed the arbitration agreement at "[e]very admission that I've done."

¶ 22        Murray testified she remembered Floyd because he was the only patient she ever had that "had a trach." (We note that (1) the parties agree Floyd had his larynx surgically removed before being admitted to Leroy Manor and (2) the "trach" Murray described may have been either a tracheotomy incision or a device, such as a collar, which works in tandem with the incision.) Murray also remembered that Floyd could "ambulate," and his son Jack was with him at admission. Murray testified that her practice was to go through the paperwork in a particular order. "I welcome them to the building, and I would take them into the office, and we would sit down and discuss all of the paperwork before they actually get admitted to whatever room that they've been assigned to." There were about 10 to 12 different documents to sign as part of the admissions paperwork, which totaled about 30 pages.

¶ 23        Counsel asked Murray if a power of attorney was one of the documents that needed

to be signed at admission, and the following exchange occurred:

"A. If they already have a power of attorney form in place, then we review that before any documents are signed. If there's not one in place, then before the person that signed as the power of attorney, that form needs to be completed with the resident designating them as the power of attorney before that person can sign any documents.

Q. Okay. So there's some kind of determination beforehand as to whether or not this resident needs to sign a power of attorney?

A. Yes.

Q. Okay. And could you tell me what that determination is?

A. If they don't have one, then we have the discussion with the resident. As long as they're able to make that determination[,] then we do the paperwork.

* * *

A. [The power of attorney is] done first. If they don't already have one when they arrive to the building, that is done first.

Q. Okay. What's your understanding of what a power of attorney is?

A. It's a person that can step in and help make decisions when that person is no longer able to.

Q. Okay. And do you know what requirements there are for a person to be able to sign a power of attorney?

* * *

A. They would need to be able to understand the form that they're signing.

Q. How do you ensure that someone understands the form that they are

signing?

A. I would go through it and ask them who they would want to help make those decisions, and I ask them if they—to make sure that they know, that you understand what you're signing as well and ask them if they have any questions about it.

Q. Do you explain what they're signing to the residents?

A. Yes, that it's a power of attorney. There's actually a question in the power of attorney that asks if they're going to—if it's to start making decisions right away or if it's to make decisions when they're actually no longer able to make them. So that would be a question that is asked as well.

Q. Okay. And what would you do if there was no power of attorney in place and you had questions about the resident's competency?

A. In order for anybody else to sign the paperwork or for them to be admitted, I mean, they would have to be deemed incompetent. And if there was no power of attorney in place, then that's where the health[ ]care surrogacy would fall into place."

¶ 24    Murray stated that residents and family could have copies of the paperwork to review before admission if it was requested but she did not recall anyone ever making that request. Murray emphasized that the arbitration agreement needed to be signed before a resident could be admitted. Whenever someone wants to read a document or look through the paperwork, Murray would stop and give them time and privacy to do so.

¶ 25    Murray testified that she discussed the nursing home contract and arbitration agreement with the resident and family at the end of the admissions process. If Murray was unable

- 9 -

to answer a question, she would direct them to the administrator or someone else who could. When it came to arbitration, Murray testified consistently with her affidavit that "I would tell them that it is a contract that helps us settle any disputes that would arise either out of the contract or the skilled nursing care that they get where we would settle outside of the court system." Murray further explained that "there would be three arbitrators that would help. They would go through the disputes. There would be three of them. One is appointed by the resident and the family, one is appointed by the facility, and then there's a neutral third party."

¶ 26        Murray acknowledged that she did not have any legal training, did not know how the legal components of the arbitration agreement worked, and Leroy Manor did not have a lawyer on staff. Murray could not explain the "prevailing party" or attorney fee provisions. She did not know what rights someone would be giving up by signing the agreement. Murray had never specifically said to new residents that they had the right to have an attorney look over the agreement, but she did recall some people asked to speak with an attorney before signing. Murray stated she would always permit the resident to consult with an attorney and that in the past some had called their attorney or spoken with them before completing admission later that day. Murray reiterated that she always tells family and residents that the arbitration agreement is "part of the admission packet, [and] that it does need to be signed prior to admission."

¶ 27        Murray further testified regarding Jack, Floyd, and his admissions process as follows:

> "Q. Now, how did you know that Jack could legally sign these agreements for his father?
>
> A. He [(Floyd)] had from the hospital a personal representative designation form that came with him from the hospital, and then at the time of admission he

completed health[ ]care power of attorney paperwork with me prior to signing all of the admission paperwork that designated Jack as his power of attorney for health care.

* * *

Q. Okay. And do you know how Floyd Dodson communicated?

A. I know that he would shake his head yes or no if you asked him questions. I know that if he did speak, it was very low because of having the trach.

Q. Do you specifically remember him speaking?

A. I mean, I don't recall a specific conversation with him.

Q. So not conversation. Do you ever remember hearing him speak?

A. I don't. I can't remember.

Q. So how would you have been able to ensure that Floyd was able to completely comprehend the rights of his power of attorney if he couldn't speak in full sentences?

A. I would review it with him, and I would make sure—I would ask him, 'Do you understand what you're signing?' And he would nod either yes or no."

¶ 28      Murray's deposition concluded as follows, discussing how she would handle potentially incompetent new residents:

"Q. What are the kind of diagnoses that someone would have that would cause them to be incompetent?

A. End-stage dementia or Alzheimer's are ones that I know off the top of my head. But, again, it would have to be a physician to deem them incompetent. I believe it's two physicians actually that have to complete a form to deem a person

- 11 -

incompetent.

* * *

Q. *** If someone had just a dementia diagnosis, do you know whether or not they could be competent?

A. That would be up to a physician to make that decision.

Q. If that wasn't included in paperwork that came through in the screening process, is there someone that you could specifically ask whether a person was competent?

A. I would speak with the social worker at the—or case manager at the hospital. That's actually something that I do before we bring a patient in is I make sure that we—that that person is capable of signing their own paperwork. And if not, then I make arrangements for that power of attorney to be there to sign paperwork as well.

Q. Okay. Do you know whether any member of Floyd's family had power of attorney in any capacity before his admission to the facility?

A. I don't believe so which is why the power of attorney was done at the time of admission. We had the personal representative form for the hospital, but the hospital did not physically have power of attorney paperwork to provide, nor did the family.

Q. So when a resident is admitted, if they do not have a power [of] attorney, then you have them fill one out on admission to the facility?

A. I assist them with appointing a health[ ]care power of attorney, yes.

Q. Is there any situation in which a resident could refuse to do so?

- 12 -

A. They do have the right to refuse, yes.

Q. Would they still be admitted to the facility if they refused to appoint a health[ ]care representative?

A. If they're capable of signing their own admission paperwork, then they can sign their own admission paperwork. However, if it's somebody that's not able to, then again that's where the health[ ]care surrogacy would come into play."

¶ 29 In her response brief, Taylor argued that Murray's deposition showed that she was aware Floyd was incompetent because she (1) had his family present to sign the admissions paperwork and (2) required Floyd to sign a power of attorney. Taylor further argued that Murray's deposition supported a finding of procedural unconscionability because she did not understand the consequences of signing the arbitration agreement and therefore could not answer questions or explain what rights were being waived by agreeing to arbitration.

¶ 30                                             4. *Defendant's Reply*

¶ 31 Defendants filed a reply brief in which they argued that Taylor had failed to show that (1) Floyd was incompetent or (2) the arbitration agreement was unconscionable. Defendants attached a supplemental affidavit from Murray in which she described the process she went through when deciding whether to have new residents sign a power of attorney. Murray testified consistently with her deposition and averred that she was present when Floyd signed the power of attorney at issue. A copy of the executed power of attorney was attached.

¶ 32 Regarding Jack's authority to sign for Floyd, defendants contended that Jack must have understood he was Floyd's agent under a health care power of attorney because he signed all the admissions paperwork on Floyd's behalf. Regarding unconscionability, defendants asserted that Murray's deposition showed that Jack had the opportunity to read, review, and ask questions

about the arbitration agreement. Accordingly, any confusion on his part was not a basis for refusing to enforce the agreement.

¶ 33                                    C. The Trial Court's Ruling

¶ 34        In December 2021, the trial court conducted a hearing on the motion. After considering the parties arguments and documents submitted in support of and in opposition to the motion, the court granted defendant's motion to dismiss. The court explained its reasoning as follows:

"It's clear that when there is a valid arbitration agreement and the parties' dispute does fall within the scope of the agreement, then arbitration is mandatory and the trial court must compel it. Also, it's—the law is pretty clear that an arbitration—arbitration agreements that are executed as a part of a resident's admission into elder care facilities are enforceable.

And so the question for this Court is this arbitration agreement that was signed by Floyd's son, Jack, (inaudible) enforceable? Is—is Floyd's health care power of attorney to his son, Jack, valid? And the Court believes that it is a valid health care power of attorney that he gave to his son, Jack. Evidencing that are the nine documents that Jack signed for his dad. Jack did sign the admission contract. And the boxes right above his signature, about a half inch above his signature, indicate that he is the health care power of attorney and the financial power of attorney as well.

Jack sure thought that he had his dad's authority[,] otherwise why would he sign as health care power of attorney, financial power of attorney, and sign nine other documents? It is clear that he knew that he was the health care power of

attorney for his father.

\*\*\*

Going on to the next question of whether or not the arbitration agreement is procedurally or substantially—or I should say, and [substantively] unconscionable is pointed out by [defense counsel]. It is the plaintiff's burden to show this. They do need to show both.

As far as procedural, I don't believe that the plaintiff has been able to show unconscionability there as the arbitration agreement is merely two pages long. It's [an] easy to read font. The waiver of the right to a jury trial is clearly spelled out in that document. And the family did have to sign them to get them into this nursing home. The plaintiff was free to decline the services of the nursing home. Certainly, they were not forced or compelled to accept admission into LeRoy Manor.

The second factor would be substantive unconscionability. Is it a one-sided or harsh agreement? No, it's not. It's a standard agreement where pre-arbitrators will be chosen to arbitrate the case. The plaintiff would have to pay—I'm sorry, the defendant would have to pay $1,500 to start it, and from time to time [as] required. And it's certainly also not unconscionable just because the arbitration agreement awards fees, cost, and attorney's fees to the prevailing party.

And so the Court is going to grant [defendants'] motion."

¶ 35    Taylor appeals pursuant to Illinois Supreme Court Rule 307(a)(1) (eff. Nov. 1, 2017). See *Hartz v. Brehm Preparatory School, Inc.*, 2021 IL App (5th) 190327, ¶ 21 ("[A]n order granting or denying a motion to compel arbitration is injunctive in nature and an appealable interlocutory order under Rule 307(a)(1).").

¶ 36                                    II. ANALYSIS

¶ 37            Taylor appeals, arguing the trial court erred by granting defendants' motion to dismiss and compel arbitration. We disagree and affirm.

¶ 38                              A. The Standard of Review

¶ 39            The Illinois Supreme Court recently addressed the appropriate standards applied to section 2-619(a)(9) motions to dismiss in *McIntosh v. Walgreens Boots Alliance, Inc.*, 2019 IL 123626, ¶ 16, 135 N.E.3d 73, in which it wrote the following:

> "Section 2-619(a)(9) of the Code permits dismissal of an action where 'the claim asserted against defendant is barred by other affirmative matter avoiding the legal effect of or defeating the claim.' 735 ILCS 5/2-619(a)(9) (West 2014). The phrase 'affirmative matter' refers to a defense that negates the cause of action completely or refutes crucial conclusions of law or conclusions of material fact contained in or inferred from the complaint. [Citation.] A motion to dismiss under section 2-619 admits [all] well-pleaded facts but does not admit conclusions of law and conclusory factual allegations unsupported by allegations of specific facts alleged in the complaint. [Citation.] In addition, a defendant does not admit the truth of any allegations in the complaint that may touch on the affirmative matters raised in the section 2-619(a)(9) motion to dismiss. [Citation.] Where a defendant presents affidavits or other evidentiary matter supporting the asserted defense, the burden shifts to the plaintiff to establish that the defense is unfounded or requires the resolution of an essential element of material fact before it is proven."

¶ 40            "When ruling on the motion, the court should construe the pleadings and supporting documents in the light most favorable to the nonmoving party." *Sandholm v. Kuecker*, 2012 IL

- 16 -

111443, ¶ 55, 962 N.E.2d 418. Appellate courts review a dismissal under section 2-619(a)(9) *de novo*, considering "whether there exists a genuine issue of material fact that should have precluded the dismissal or, absent such an issue of fact, whether dismissal is proper as a matter of law." *McIntosh*, 2019 IL 123626, ¶ 17.

¶ 41          B. Validity of the Arbitration Agreement and the Health Care Power of Attorney

¶ 42          Taylor first argues that the arbitration agreement was unenforceable because (1) Floyd lacked the capacity to contract and (2) Jack was not acting under a valid power of attorney. Taylor does not dispute that (1) Floyd and Jack signed the arbitration agreement and (2) if the agreement is enforceable, the survival claims would be subject to arbitration.

¶ 43                                    1. *The Law*

¶ 44          A person authorized by a health care power of attorney may bind a principal to an arbitration agreement as part of a contract to receive nursing home care if the arbitration provision is integral to the entire agreement and required for admission. *Fiala v. Bickford Senior Living Group, LLC*, 2015 IL App (2d) 141160, ¶ 45, 32 N.E.3d 80. However, a principal will not be bound by an arbitration agreement signed by an agent under a health care power of attorney if the agreement is separate from the contract for services and not required for admission. *Id.* ¶ 44; see also *Curto v. Illini Manors, Inc.*, 405 Ill. App. 3d 888, 894, 940 N.E.2d 229, 234 (2010). Likewise, if the principal did not sign the agreement, the party seeking to enforce the arbitration agreement must present evidence that the representative signing on the principal's behalf had actual authority to do so. *Curto*, 405 Ill. App. 3d at 894.

¶ 45          "[O]nce a defendant shows that a legal and binding contract existed, the burden shifts to the plaintiff to prove it invalid ***." (Internal quotation marks omitted.) *Kero v. Palacios*, 2018 IL App (1st) 172427, ¶ 33, 140 N.E.3d 789. Because defendants presented an affidavit

- 17 -

supporting the validity of the arbitration agreement attached to it, Taylor was required to come forward with evidentiary material demonstrating its invalidity. *Id.* ¶ 29 ("Based on this evidence, [one of the defendants] carried its burden of showing it was a party to the arbitration agreement, thereby shifting the burden to [the plaintiff] to raise an issue of fact on this issue or show that the agreement was otherwise invalid."). The same is true of the health care power of attorney.

¶ 46        "By presenting an affidavit supporting the basis for the motion, the defendant satisfies the initial burden of going forward on the motion, and the burden then shifts to the plaintiff. [*Kedzie and 103rd Currency Exchange, Inc. v.*] *Hodge*, 156 Ill. 2d [112,] 116, 619 N.E.2d 732[, 735 (1993)]. In order to establish that the motion is unfounded, a counter[-]affidavit or other proof is necessary to refute the evidentiary facts properly asserted by the affidavit supporting the motion. [*Id.*]" *Hollingshead v. A.G. Edwards & Sons, Inc.*, 396 Ill. App. 3d 1095, 1101-02, 920 N.E.2d 1254, 1260 (2009). "Here, the defendants filed a motion to dismiss and compel arbitration and supported their motion with the contracts containing the arbitration provisions and an affidavit establishing their evidentiary foundation. *** [D]efendants met their initial burden of going forward with their motion and the burden shifted to the plaintiff to establish a defense to the validity of all four arbitration provisions by counter[-]affidavit or other proof." *Id.* at 1102.

¶ 47        Regarding capacity to contract, Illinois courts have consistently held as follows:

> "The burden of proving mental incompetence is on the party seeking to set aside a transaction. [Citation.] Persons of mature age are presumed to be mentally competent; their incompetence cannot be inferred merely from old age, physical illness or defective memory. [Citation.] Impairment of the mind incident to old age and disease will not invalidate a transaction so long as the person in question was able to comprehend the nature of the transaction and to protect her interests." *In re*

*Estate of Gruske*, 179 Ill. App. 3d 675, 678, 534 N.E.2d 692, 695 (1989).

¶ 48                                   2. *This Case*

¶ 49        In her brief, Taylor claims, "At the time of his admission to Leroy Manor, Floyd

Dodson did not have the necessary mental capacity to bind himself to the arbitration agreement,

nor did he have the requisite capacity to confer Powers of Attorney to Jack Dodson." "Accordingly,

for Floyd to have had contractual capacity, he would have had to understand the terms in the Power

of Attorney for Health Care form, and he further would have had to understand the effect that the

designation of authority to Jack would have, including the implications of the arbitration

agreement." "Floyd did not have the capacity to be able to comprehend the full nature and effect

of his acts [(*McGlaughlin v. Pickerel*, 381 Ill. 574, 580, 46 N.E.2d 368, 371 (1943))], nor did he

have sufficient mind and memory to understand the terms of the arbitration agreement. [(*Jackson*

*v. Pillsbury*, 380 Ill. 554, 573, 44 N.E.2d 537, 546 (1942)).]"

¶ 50        Floyd was 85 years old, had dementia, an eighth-grade education, could not read,

and could not speak but could communicate by nodding in response to yes and no questions.

According to Leroy Manor's nursing notes, the day after Floyd was admitted, he was transferred

to "Garden Court," the facility's wing for patients with dementia. Taylor argues that Murray's

testimony supports an inference that Murray believed Floyd lacked capacity to sign the admissions

paperwork on his own. Murray testified that if she had any questions about a resident's cognition,

she would "insist that the potential new resident's representative be present for the discussion

relating to the contract and agreement." Murray testified that she would arrange for family to come

and sign the admissions forms if the patient was incapable of doing so. Murray noted that Floyd

did not have a power of attorney prior to admission and required his family be there to sign on his

behalf, suggesting that she should have been aware that Floyd could not execute the power of

attorney.

¶ 51        Taylor further notes that aside from signatures, Murray was the only person to write on the power of attorney form Floyd signed. Murray also stated she relied on a hospital form that designated Jack and Floyd's two daughters as persons who could receive medical information about Floyd. However, that form dealt with information only, not decision-making authority, and Taylor claims Floyd would have had no way to tell Murray that Jack was the person he wanted to act for him under the power of attorney. Taylor contends that the evidence in the record shows that Floyd had no way to communicate with Murray, ask questions, read the material, or understand what he was being asked to sign. Jack and Taylor never saw Floyd sign anything and were never told he had signed a power of attorney, nor did Floyd ever give Jack authority to act pursuant to a power of attorney before he was admitted to Leroy Manor.

¶ 52        In her reply brief, Taylor responds to defendants' claims concerning the conclusory nature of her supporting affidavits by suggesting that cases dealing with summary judgment are distinguishable from this case, which involves a section 2-619 motion to dismiss. However, Illinois Supreme Court Rule 191 (eff. Jan. 4, 2013) applies with equal force to affidavits in support of and opposing motions to dismiss pursuant to section 2-619 *and* motions for summary judgment under section 2-1005. *Clemons v. Nissan North America, Inc.*, 2013 IL App (4th) 120943, ¶ 36, 997 N.E.2d 307. Accordingly, the conclusory nature of the allegations in her supporting affidavits does present a problem.

¶ 53        We note that because the defendants failed to challenge the affidavits in the trial court, that argument is forfeited, and the defendants are barred from challenging the affidavits on Rule 191 grounds. Nonetheless, the purpose of Rule 191 is to ensure that the trial court considers facts admissible as evidence. The court said little about the affidavits when ruling on the motion

to dismiss, and this court may affirm on any basis appearing in the record. See *Masters v. Murphy*, 2020 IL App (1st) 190908, ¶ 9.

¶ 54 In this case, Taylor had the burden of showing that Floyd was incompetent to execute the power of attorney. Floyd is presumed competent despite old age and illness. *Gruske*, 179 Ill. App. 3d at 678. As Taylor points out, all Floyd needed was to comprehend the nature and effect of his act of signing the health care power of attorney. Jack and Taylor's affidavits provide a factual basis for why Floyd could not have read and understood the forms on his own, but they do not address his ability to understand things generally or with assistance. Murray testified that she went through the power of attorney with Floyd and made sure to ask him yes or no questions so he could respond nonverbally. Nothing in the record suggests Floyd was incapable of understanding the need to designate a person to make health care decisions for him, especially if it had been explained to him in short, simple, easy to understand statements.

¶ 55 Nothing about the affidavits is inconsistent. Taylor apparently does not contest the signatures, maintaining only that no one saw Floyd sign the documents. But, Floyd could have signed the health care power of attorney first, as was Murray's practice. Moreover, the circumstances support the trial court's conclusion that Jack was aware he was acting as Floyd's legal representative. Jack admitted in his affidavit that he signed the documents on behalf of his father and that he believed he had to sign them on behalf of his father for Floyd to receive care. Jack was correct. Leroy Manor *did* require the admissions paperwork to be completed and agreed to by the resident, the resident's representative, or both prior to providing care. Jack's signing of multiple documents on Floyd's behalf suggests that he was aware of his authority to bind his father. Surely he did not think that this was an exercise for him to practice his handwriting, but instead an actual agreement that he was making. Jack's signing them outside of his father's presence further

suggests that both he and Murray were operating on the understanding that Jack had the authority to sign for Floyd.

¶ 56        The defendants met their burden of production by putting forth the fully executed contract, arbitration agreement, and health care power of attorney. Taylor had the burden to rebut this evidence and the presumption that Floyd had the capacity to contract. Taylor did not meet her burden, and the trial court correctly concluded that the power of attorney was valid.

¶ 57        C. Unconscionability

¶ 58        1. *The Law*

¶ 59        "A contract term can be invalidated on the basis of 'substantive' unconscionability, 'procedural' unconscionability, or a combination of both." *Zuniga v. Major League Baseball*, 2021 IL App (1st) 201264, ¶ 14 (quoting *Razor v. Hyundai Motor America*, 222 Ill. 2d 75, 99, 854 N.E.2d 607, 622 (2006)). The Illinois Supreme Court has summarized both types of unconscionability as follows:

> "Procedural unconscionability consists of some impropriety during the process of forming the contract depriving a party of a meaningful choice. *** Substantive unconscionability concerns the actual terms of the contract and examines the relative fairness of the obligations assumed, asking whether the terms are so one-sided as to oppress or unfairly surprise an innocent party." (Internal quotation marks omitted.) *Phoenix Insurance Co. v. Rosen*, 242 Ill. 2d 48, 60, 949 N.E.2d 639, 647 (2011).

"[T]he issue of unconscionability should be examined with reference to all of the circumstances surrounding the transaction." *Kinkel v. Cingular Wireless LLC*, 223 Ill. 2d 1, 24, 857 N.E.2d 250, 265 (2006).

¶ 60    "Procedural unconscionability refers to a situation where a term is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it, and also takes into account a lack of bargaining power." *Razor*, 222 Ill. 2d at 100. "Factors to be considered are all the circumstances surrounding the transaction including the manner in which the contract was entered into, whether each party had a reasonable opportunity to understand the terms of the contract, and whether important terms were hidden in a maze of fine print; both the conspicuousness of the clause and the negotiations relating to it are important, albeit not conclusive factors in determining the issue of unconscionability." *Zuniga*, 2021 IL App (1st) 201264, ¶ 14. Unconscionability is also more likely to be found where the transaction involves a "consumer, a disparity in bargaining power, and the presence of the allegedly unconscionable provision on a preprinted form." *Id.* ¶ 15.

¶ 61    However, procedural unconscionability will not be found merely because the provision is (1) imposed through a standardized contract of adhesion or (2) "presented in fine print or uses legal language that an average consumer might not fully understand." *Id.* Such contracts are "a fact of modern life," and consumers "routinely sign such agreements to obtain" a wide variety of products and services crucial to everyday life without those contracts being "so procedurally unconscionable as to be unenforceable." *Kinkel*, 223 Ill. 2d at 26. "Generally, absent fraud, the act of signing legally signifies that the individual had an opportunity to become familiar with and comprehend the terms of the document he or she signed. An individual 'who has had an opportunity to read a contract before signing, but signs before reading, cannot later plead lack of understanding.' [Citation.]" *Hawkins v. Capital Fitness, Inc.*, 2015 IL App (1st) 133716, ¶ 14, 29 N.E.3d 442.

¶ 62    "[I]ndications of substantive unconscionability are [(1)] contract terms so one-

sided as to oppress or unfairly surprise an innocent party, [(2)] an overall imbalance in the obligations and rights imposed by the bargain, and [(3)] significant cost-price disparity." (Internal quotation marks omitted.) *Rosen*, 242 Ill. 2d at 75. Courts may examine and consider the entire contract or agreement as a whole when determining the conscionability of an arbitration provision. *Harz v. Brehm Preparatory School, Inc.*, 2021 IL App (5th) 190327, ¶¶ 53, 56.

¶ 63 The question of whether a contract or contract provision is unconscionable is a question of law, which this court reviews *de novo*. *Zuniga*, 2021 IL App (1st) 201264, ¶ 11; *Kinkel*, 223 Ill. 2d at 22. "There is a 'strong public policy in favor of enforcing arbitration agreements.' " *Tortoriello v. Gerald Nissan of North Aurora, Inc.*, 379 Ill. App. 3d 214, 227, 882 N.E.2d 157, 170 (2008) (quoting *Kinkel*, 223 Ill. 2d at 47).

¶ 64 2. *This Case: Procedural Unconscionability*

¶ 65 Taylor argues that the agreement was procedurally unconscionable in part because (1) Jack and Taylor did not understand the terms of the arbitration agreement and (2) Murray did not and could not fully explain the arbitration agreement. Taylor misses the mark. Neither Jack nor Taylor averred that they had questions that went unanswered or that they did not have time to review the arbitration agreement. Murray testified that if she could not answer a question, she would get someone who could, like the administrator of Leroy Manor. Further, Murray routinely gave people privacy and time to review the documents if they needed it. Some even called attorneys. Jack and Taylor's lack of understanding is not Murray's fault. Instead, Jack and Taylor can only blame themselves given that they had time to review the arbitration agreement and did not have any questions. They either (1) did not read the terms before signing, (2) did not understand the terms but signed anyway, or (3) understood the terms and signed anyway.

¶ 66 For similar reasons, the agreement was not procedurally unconscionable. The

agreement was a separate, two-page document titled "Arbitration Agreement." The font was in all italics and was easily legible. The terms were not difficult to understand, and if any confusion existed, Murray was available to do whatever was necessary to clear up the confusion.

¶ 67     Taylor claims the parties had unequal bargaining power, but the undisputed facts suggest otherwise. Taylor and Jack averred that had they known the arbitration agreement was mandatory, they would have gone someplace else. Their willingness to look elsewhere for services demonstrates that they had significant bargaining power, so much so that disagreement with a single term—albeit a significant one—would have been enough for them to reject the deal entirely. Jack and Taylor were not rushed into signing and apparently had other options for nursing home care. The arbitration provisions were not hidden in fine print or set forth in technical jargon and legalese; it was explicitly set forth on its own separate document. The agreement was 2 out of just 32 pages of information presented. And no evidence exists that any information was kept from Jack or Taylor. Nothing about the transaction suggests coercion or deception.

¶ 68     3. *This Case: Substantive Unconscionability*

¶ 69     Taylor baldly asserts that the agreement is "entirely one-sided" for defendants. However, Taylor's complaints come down to two issues: (1) jury waiver and (2) fees and costs.

¶ 70     Because arbitration is an alternative to judicial resolution of claims, a waiver of the right to a trial by jury in civil cases is inherent in arbitration. See *Carter v. SSC Odin Operating Co., LLC*, 237 Ill. 2d 30, 50, 927 N.E.2d 1207, 1220 (2010). Murray consistently explained arbitration in such a manner. Taylor also complains that the arbitration agreement contained a jury waiver if the claims were litigated in court. The agreement to have a bench trial is explicit and plainly worded.

¶ 71     The prevailing party provisions do not favor one party over the other. Taylor insists

that a business is necessarily in a better position than an individual when it comes to legal knowledge and financial resources. However, even if we assume that claim to be true, it provides no support for Taylor's assertion of substantive unconscionability. Were we to conclude otherwise, any arbitration agreements between a business and an individual would almost always then be suspect and subject to the same attack.

¶ 72　　　　The parties agree that defendants are required to pay the initial $1500 retainer and any further costs during the arbitration. And the agreement states that the *arbitrators'* fees and costs will be assigned to the prevailing party as part of the judgment. The parties are responsible for their own arbitration costs no matter the outcome. Such a provision brings the arbitration agreement in line with the traditional American rule, requiring a party to pay the costs of that party's legal representation.

¶ 73　　　　The agreement here is not so one-sided as to be oppressive. The parties have equal input regarding the arbitrators who will decide their case. Defendants bear the burden of paying the arbitrators' fees and costs and may only recover those sums if they prevail in arbitration and the parties do not agree to a different payment scheme. The fee-shifting provisions are not as advantageous as those in the Nursing Home Care Act, but they are not one sided. The parties are generally on equal footing. The prevailing party does have a financial advantage, but nothing in the arbitration agreement makes one party or the other more likely to prevail; each side bears the same risk. Accordingly, we conclude that the trial court did not err by rejecting Taylor's claim of substantive unconscionability.

¶ 74　　　　　　　　　　　　　III. CONCLUSION

¶ 75　　　　For the reasons stated, we affirm the trial court's judgment.

¶ 76　　　　Affirmed.